## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **BRISTOW FIRST ASSEMBLY OF GOD,** *et. al.,* | ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | **Case No. 4:15-cv-00523-TCK-CDL** |
| **BP p.l.c.,** *et. al.,*; | ) ) | |
| Defendants. | ) ) ) | |

---

### PLAINTIFFS' RESPONSE TO DEFENDANT KINDER MORGAN, INC.'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF

Plaintiffs Bristow First Assembly of God, Mark S. Evans, and Christina J. Evans, individually and as parents and next of kin to C.J.E. and B.K.E., minor children (collectively, "Plaintiffs") file this *Response to Defendant Kinder Morgan, Inc.'s Motion for Summary Judgment and Brief in Support Thereof* [Dkt. 287] and respectfully show the Court as follows:

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................................. 2

TABLE OF AUTHORITIES ...................................................................................... 4

I.    PLAINTIFFS' RESPONSES TO KINDER MORGAN'S STATEMENT OF FACTS ...... 8

II.   PLAINTIFFS' STATEMENT OF FACTS ....................................................... 11

  A.   Wilcox Site Refinery Operations Resulted in Massive, Latent Contamination.... 12

  B.   Tenneco Attempts to Cover Up Contamination and Escape Liability Through
       Dissolution and the Trust ....................................................................... 14

  C.   USEPA Identifies Kinder Morgan as a Potentially Responsible Party ................ 15

  D.   The Church and Evans Family Learn of Contamination in July 2013. ............... 15

III.  LEGAL STANDARD AND SUMMARY JUDGMENT EVIDENCE ............................ 19

IV.   LEGAL ARGUMENT ................................................................................. 21

  A.   Wilcox Liabilities Extend to Kinder Morgan......................................... 21

       i.     The dissolution and Trust do not discharge Wilcox liabilities ................. 21

       ii.    The EPEC dissolution did not comply with Delaware law...................... 23

       iii.   The summary judgment evidence supports veil piercing ........................ 25

  B.   Limitations Does Not Defeat Plaintiffs' Claims .................................... 27

       i.     Summary judgment cannot resolve factual disputes............................... 28

       ii.    The discovery rule tolled the start of limitations until at
              least July 2, 2013......................................................................... 29

       iii.   Knowledge of refining operations did not begin the limitations period ... 33

       iv.    Limitations does not apply to public nuisance........................................ 35

       v.     Limitations could not begin until the damage was
              obviously permanen. ..................................................................... 38

  C.   Failure to Clean Up the Wilcox Site Constitutes a Tort....................... 38

       i.     Kinder Morgan is liable for public nuisance.............................................. 39

       ii.    Kinder Morgan is liable for negligence .................................................... 41

       iii.   Plaintiffs have a claim under a strict liability theory ............................... 41

   iv. Plaintiffs have a claim for unjust enrichment ............................................ 41

  D. "Dismissal" of Plaintiffs' Claims for Personal Injury, Real Property Damage, and Punitive Damages Is Improper ........................................................................ 42

V. CONCLUSION ............................................................................................................ 43

CERTIFICATE OF SERVICE ................................................................................................. 45

# TABLE OF AUTHORITIES

### CASES

*Adamson v. Multi Cmty. Diversified Servs., Inc.*,
514 F.3d 1136 (10th Cir. 2008) ............................................................................19

*In re Autobacs Strauss, Inc.*,
473 B.R. 525 (Bankr. D. Del. 2012) .....................................................................26

*Blocker v. ConocoPhillips Co.*,
378 F.Supp.3d 1066 (W.D. Okla. 2019)...............................................................36

*Blocker v. ConocoPhillips Co.*,
380 F.Supp.3d 1178 (W.D. Okla. 2019).................................................37, 40, 41

*Branch v. Mobil Oil Corp.*,
778 F.Supp. 35 (W.D. Okla. 1991).......................................................................42

*Burlington Northern and Santa Fe Railroad Co. v. Grant*,
505 F.3d 1013 (10th Cir. 2007)..............................................................39, 40, 42

*Calvert v. Swinford*,
382 P.3d 1028 (Okla. 2016) ..................................................................................38

*Carter-Jones Lumber Co. v. LTV Steel Co.*,
237 F.3d 745 (6th Cir. 2001) ................................................................................26

*Cole v. Asarco Inc.*
No. 03-CV-327-GKF-TLW, 2011 WL 1667290 (N.D. Okla. May 3, 2011)...........37

*Continental Oil Co. v. Williams*,
250 P.2d 439 (Okla. 1952) ....................................................................................28

*Davis v. Shell Oil Co.*,
795 F.Supp. 381 (W.D. Okla. 1992)................................................................28, 36

*Evans v. Asarco, Inc.*,
No. 04-CV-94-GKF-PJC, 2011 WL 1842775 (N.D. Okla. May 16, 2011) ............37

*Fischer v. Atl. Richfield Co.*,
774 F. Supp. 616 (W.D. Okla. 1989).....................................................................36

*Gish v. ECI Serv. of Okla., Inc.*,
162 P.3d 223 (Okla. 2006) ....................................................................................27

*Gould v. American Hawaiian S.S. Co.*,
331 F.Supp. 981 (D. Del. 1971)............................................................................43

*Harper-Turner Oil Co. v. Bridge,*
311 P.2d 947 (Okla. 1957) ...........................................................................29, 38

*Kang v. Kang,*
11 P.3d 218 (Okla. Civ. App. 2000) ..........................................................................38

*In re Kraft-Murphy Co. Inc.,*
82 A.3d 696 (Del. 2013) ...........................................................................22, 23, 24

*Lovelace v. Keohane,*
831 P.2d 624 (Okla. 1992) ...........................................................................29, 30

*McAfee v. Duke Energy Field Services, L.P.,*
CIV-05-672-C, 2005 WL 8157799 (W.D. Okla. Oct. 25, 2005)..............................29

*Meinders v. Johnson,*
134 P.3d 858 (Okla. 2005) ...........................................................................40, 41, 42

*Miller v. Glaxosmithkline,*
No. 03-CV-393 K (J), 2005 WL 8174802 (N.D. Okla. Jan. 27, 2005) (Kern, U.S.D.J.). *passim*

*Moneypenney v. Dawson,*
141 P.3d 549 (Okla. 2006) ...........................................................................34

*Moore v. Texaco, Inc.,*
244 F.3d 1229 (10th Cir. 2001).............................................................................40, 42

*N.C. Corff Partnership, Ltd. v. OXY USA, Inc.,*
929 P.2d 288 (Okla. 1996) ...........................................................................33, 34, 41

*North v. Evans,*
185 P.2d 901 (Okla. 1947) ...........................................................................28

*Ohio Oil Co. v. Elliott,*
254 F.2d 832 (10th Cir. 1958).............................................................................41

*Outokumpu Engineering Enterprises, Inc. v. Kvaerner EnviroPower, Inc.,*
685 A.2d 724 (Del. Ch. 1996).............................................................................25

*Ponca Tribe of Indians of Okla. V. Continental Carbon Co.,*
No. CIV-05-445-C, 2008 WL 11338469 (W.D. Okla. Nov. 21, 2008) ....................36

*Quaker State Corp. v. U.S. Coast Guard,*
681 F.Supp. 280 (W.D. Pa. 1988) ...........................................................................30

*Schrock v. Wyeth, Inc.,*
727 F.3d 1273 (10th Cir. 2013).............................................................................29, 31

*Sherwin-Lecas v. ConocoPhillips Co.*,
   No. CIV-08-1098, 2010 WL 11509175 (W.D. Okla. Mar. 22, 2010) ....................................28

*Skelly Oil Co. v. Humphrey*,
   158 P.2d 175 (Okla. 1945) ..............................................................................................29

*Sloan v. Canadian Valley Animal Clinic, Inc.*,
   719 P.2d 474 (Okla. 1985) ..............................................................................................28

*Tomlinson v. Combined Underwriters Life Ins. Co.*,
   No. 08-CV-259-TCK-FHM, 2009 WL 2923010 (N.D. Okla. Sept. 9, 2009) .........................32

*Tosco Corp. v. Koch Industries, Inc.*,
   216 F.3d 886 (10th Cir. 2000) ....................................................................37, 38, 39, 40

*U.S. v. Kaysar-Roth Corp.*,
   272 F.3d 89 (1st Cir. 2001) ..............................................................................................26

*Wells v. Lowe's Home Centers, Inc.*,
   No. 06-CV-150-JHP, 2008 WL 2783161 (N.D. Okla. July 15, 2008) ....................................33

*Winner Acceptance Corp. v. Return on Capital Corp.*,
   No. 3088-VCP, 2008 WL 5352063 (Del. Ch. Dec. 23, 2008) ..................................................26

*Woods v. Prestwick House, Inc.*,
   247 P.3d 1183 (Okla. 2011)..............................................................................................27

## STATUTES, RULES & REGULATIONS

8 Del. C. § 280 .....................................................................................................................22, 23

8 Del. C. § 281 ....................................................................................................................... *passim*

8 Del. C. § 282 ...........................................................................................................................22

78 FR 75475............................................................................................................................12, 13

Fed.R.Civ.P. 56(c) .....................................................................................................................19

Local Rule 56.1(c) ........................................................................................................................8

Okla. Const. art. II, § 19.............................................................................................................27

Okla. Stat. tit. 50, § 1 ................................................................................................................42

Okla. Stat. tit. 50, § 5 ................................................................................................................40

Okla. Stat. tit. 50, § 7 ............................................................................................................36, 37

## OTHER AUTHORITIES

Jonathan Macey & Joshua Mitts, *Finding Order in the Morass:  The Three Real Justifications for Piercing the Corporate Veil*, 100 Cornell L. Rev. 99 (2014) .......................26

Peter B. Oh, *Veil-Piercing*, 89 Tex. L. Rev. 81, 116 (2010)...........................................................25

*Superfund*, USEPA, https://www.epa.gov/superfund (last visited Nov. 12, 2020) .......................13

Through its *Motion for Summary Judgment and Brief in Support* (the "<u>Motion</u>"), Kinder Morgan requests that this Court settle contested issues of fact that are the province of the jury, including issues such as when Plaintiffs knew or should have known of their injuries and whether the corporate veil should be pierced. Kinder Morgan also requests that the Court disregard binding and persuasive legal precedent regarding the core legal disputes in this case, including whether limitations applies to Plaintiffs' public nuisance claims and whether pollution constitutes a public nuisance under Oklahoma law. For the reasons stated herein, Plaintiffs respectfully request that the Court ***deny*** the *Motion*, and set this matter for a jury trial at the first available date.

## I.   PLAINTIFFS' RESPONSES TO KINDER MORGAN'S STATEMENT OF FACTS

Pursuant to Local Rule 56.1(c), Plaintiffs assert that the following "undisputed facts" in the *Motion* are controverted:

<u>Paragraph 4</u>:   Plaintiffs dispute Kinder Morgan's assertion that the "Wilcox Refinery was located across the tracks, on property east of the Railroad right-of-way." This factual assertion is disputed, as evidenced by Oklahoma Department of Environmental Quality ("<u>ODEQ</u>") records submitted by Kinder Morgan in support of the *Motion*: "It is assumed that Wilcox Oil Company expanded operations at some later date since they acquired the former Lorraine Refinery facility west of the railroad and the tank farm area to the east." [*Motion*, <u>Exhibit 24</u> at 5].

<u>Paragraph 12</u>: Plaintiffs dispute that aerial photos conclusively show that no refinery facilities were on the Church property from 1937 to present. This factual assertion is disputed, as evidenced by ODEQ records stating that the "Wilcox Oil Company expanded operations at some later date since they acquired the former Lorraine Refinery facility west of the railroad and the tank farm area to the east." [*Id.*]. At most, the photos show that no facilities were on the Church property at a specific moment in time.

Paragraph 13:  Plaintiffs dispute that "Wilcox never undertook any operations on the Church Property."  This factual assertion is disputed, as evidenced by ODEQ records stating that the "Wilcox Oil Company expanded operations at some later date since they acquired the former Lorraine Refinery facility west of the railroad and the tank farm area to the east."  [*Id.*].

Paragraph 14:  Plaintiffs dispute the characterization of Mr. Fisher's expert opinions.  Mr. Fisher's expert report clearly states that the groundwater among the entire Wilcox Site is interconnected such that contaminants can move from one portion of the site to another.  [Exhibit 7 at 14].  In his deposition, Mr. Fisher stated that "we don't have enough subsurface information to know" whether groundwater flows from the Church property to the Wilcox Process Area, or vice-versa.  [*Motion*, Exhibit 8 at 207:16-208:8].  Since the date of his deposition, the U.S. Environmental Protection Agency ("USEPA") has made geologic information regarding the Wilcox Site available, and the geologic information demonstrates that perched groundwater flows from the Wilcox Process Area to the Church property.  [Exhibit 6; Exhibit 8].

Paragraph 18:  Plaintiffs dispute Kinder Morgan's assertion that "EPEC Oil f/k/a Tenneco Oil was dissolved pursuant to Section 281(b) of the Delaware General Corporation Law" (which is a conclusion of law and not a fact) for all of the reasons stated in Section IV.A herein.

Paragraph 19:  Plaintiffs dispute Kinder Morgan's assertion that the "Trust was funded with assets of over $93 million."  [*Motion*, Exhibit 15 at 2 ("WHEREAS, the Company desires to have the Trustee take title to and hold in trust . . . all of the Company's property . . . ***other than*** an intercompany receivable from New Midwestern, Inc. in the amount of approximately $93 million (the "NMI Receivable"), which has been distributed to the sole stockholder of the Company in accordance with the [Distribution] Plan.") (emphasis added)].

Paragraph 22:  Plaintiffs dispute Kinder Morgan's assertion that it "acquired" El Paso Corporation.  Kinder Morgan and El Paso merged, with Kinder Morgan remaining as the surviving entity.  [*Motion*, Exhibit 17 at 2].

Paragraph 25: Plaintiffs dispute that Mr. Evans documented "the Church's extensive historical knowledge of contamination at the Church property."  As discussed in *Plaintiffs' Objections and Motion to Strike Defendant Kinder Morgan, Inc.'s Summary Judgment Evidence*, in his deposition, Mr. Evans testified that the memorandum identifies "potential[] areas of discovery" by Church members, that he believes that some of the information contained within the memorandum is inaccurate, and that he is unaware of "any individuals specifically who shared this information." [Exhibit 16 at 156:2-157:4, 165:14-23].  Further, Mr. Evans testified that he did not personally speak to the Church members who found the potential areas of discovery identified in the memorandum, that many of the Church members referenced in the memorandum "were not alive or able to communicate . . . directly," and that the information contained in the memorandum was conveyed to him through various intermediaries—including the Church board, Dale Allen, and Doug Sampley.  [*Id.* at 156:12-20].

Paragraph 26: Plaintiffs dispute that Mr. Evans documented actual contamination, as opposed to possible contamination, and that the memorandum, which Mr. Evans testified is inaccurate and which relays third-hand hearsay accounts of possible contamination seen by those who attended the Church at an indeterminate time, details the "Church's longstanding knowledge." [*Id.* at 156:2-157:4, 165:14-23].

Paragraphs 31 and 32:  Plaintiffs dispute Kinder Morgan's suggestion that Mr. Dorsey testified that the majority of the Church property was "off-limits" to children because of contamination.  Mr. Dorsey's deposition transcript is clear that the majority of the Church property

was "off-limits" to children because of exposed piping and concrete formations.  [Exhibit 19 at 49:3-8; 61:22-25].

Paragraph 43:  Plaintiffs dispute Kinder Morgan's suggestion that Mr. Sampley definitively connected "specks of black" in the parsonage toilet bowl to oil.  Mr. Sampley's deposition transcript states that he did not know the cause of the substance, and that it could have been connected to mold.  [Exhibit 20 at 25:6-25].

Paragraph 44:  Plaintiffs dispute Kinder Morgan's assertion that Mr. Sampley "received a notice from" USEPA "[o]n June 26, 1996."  Although Mr. Sampley appears to have signed an access agreement related to the USEPA notice referenced, Mr. Sampley testified during deposition that he did not remember receiving or reviewing the notice before.  [Id. at 75:12-76:6].

Paragraph 48:  Plaintiffs dispute Kinder Morgan's assertion that Mr. Allen "knew that the well on the Church Property was contaminated" with non-natural contaminants in 1991.  Mr. Allen's deposition testimony asserts that the well was only contaminated insofar as it needed additional equipment to make the water drinkable.  [Exhibit 18 at 175:24-176:14].

Paragraph 65:  Plaintiffs dispute Kinder Morgan's assertion that Todd Downham talked with Church personnel regarding the status of the USEPA investigation regarding the Wilcox Site prior to May 24, 2013.  [Exhibit 1, ¶ 5; Exhibit 16 at 79:24-80:3 (July 2, 2013 first time Mr. Evans spoke with ODEQ); Exhibit 18 at 182:23-183:17 (in reference to environmental investigation: "We did not know.  We were waiting for them . . . Nobody told us.")].

## II.    PLAINTIFFS' STATEMENT OF FACTS

1.    This case concerns massive, latent contamination on a Superfund site in Bristow, Oklahoma, and the effect of such contamination on the Bristow First Assembly of God Church and the Evans Family.  In short, the soil and groundwater at the Wilcox Site became contaminated and polluted by refining companies that historically owned and operated the site.  Not knowing about

the contamination, the Bristow First Assembly of God (the "Church") built a church and parsonage (in which the Evans Family lived) on the Wilcox Site.   USEPA added the Wilcox Site to the National Priorities List on December 12, 2013 and suit was brought in this matter on June 24, 2015.  *See* 78 FR 75475; Dkt. 2-2.

> **A.**     **Wilcox Site Refinery Operations Resulted in Massive, Latent Contamination.**

2.     The Wilcox Site concerns land that previously contained two refineries and two tank farms just outside the city limits of Bristow, Oklahoma.  [*Motion*, Exhibit 24 at 3-4].  The Wilcox Site consists of the former Lorraine Refinery (constructed on land now owned by the Church), the Wilcox Refinery (initially constructed on land immediately to the east of the Church and later expanded onto the Church property), the North Tank Farm (immediately to the north of Church), and the East Tank Farm (immediately to the east of the Wilcox Refinery).

3.     Refining operations on the Wilcox Site began in the 1920s and continued through 1963. [*Id.* at 3].  Refining activities on the Wilcox Site had an estimated capacity of 4,000 barrels of oil per day, which resulted in an estimated waste stream of approximately 40 barrels per day. [*Id.* at 5, 6].  To feed the refineries, unprocessed crude oil was brought in directly from the field, which resulted in crude with high bottom sediment and water.  [*Id.* at 5].

4.     The refineries were poorly constructed and environmentally unfriendly, even by pre-1960s standards.  For example, according to ODEQ, the crude oil storage tanks lacked any metal or wooden bottoms, allowing crude oil to seep directly into the dirt and groundwater. [Exhibit 21 at 25:8-18].  Further, the refineries used open pits and gravity to separate wastewater from oil, and no liner was used to prevent wastewater and oil from seeping directly into the soil and groundwater.  [*Id.* at 25:19-26:9].  Likewise, no liners were used to prevent direct discharge into the soil and groundwater at the skimming pond.  [*Id.* at 26:25-27:13].  When the refinery operations were concluded, the soil and water impacts from the refining operations were left in

place, without any warning to future owners.  [Exhibit 5 at 2].  As time passed, the left in place contamination soaked beneath the surface such that the contamination became latent, and not obvious to unsuspecting future landowners.  [*Id.* at 6].

5.      As a direct result of the refining and oil storage activities on the Wilcox Site, the soil and groundwater underlying the Church property is now highly contaminated with heavy metals and hydrocarbons.  [*Id.* at 5].  That the Wilcox Site is heavily contaminated is beyond legitimate dispute.  USEPA has enrolled the Wilcox Site in the Superfund Program, which is "responsible for cleaning up some of the nation's most contaminated land and responding to environmental emergencies . . . ." *Superfund*, USEPA, https://www.epa.gov/superfund (last visited Nov. 12, 2020); 78 FR 75475.  Further, the Wilcox Site has been added to the National Priorities List, which consists of sites "where releases of contamination pose human health and environmental risks." *Superfund*, USEPA, https://www.epa.gov/superfund (last visited Nov. 12, 2020); 78 FR 75475.

6.      The Wilcox Site (which USEPA added to the National Priorities List as a single, contaminated site for cleanup purposes) contains several individual, privately-owned parcels, each of which is contaminated, and contamination and pollutants migrate from adjoining parcels to the Church property.  [Exhibit 6; Exhibit 7 at 14].  Among other reasons, groundwater and contaminates migrate across the Church property to reach the Sand Creek.  [Exhibit 6; Exhibit 7 at 14; *Motion*, Exhibit 24 at 14].  The Sand Creek is a jurisdictional, navigable waterway.  [Exhibit 25 at 7].

**B.    Tenneco Attempts to Cover Up Contamination and Escape Liability Through Dissolution and the Trust.**

7.     The Wilcox Oil Company ("Wilcox") initially owned and operated the refinery to the immediate east of the Church property.  [*Motion*, ₱ 4].  Wilcox also purchased what would become the Church property (and which formerly contained the Lorraine Refinery) and "expanded operations" onto the tract.  [*Id.*, Exhibit 24 at 5].  In 1965, Wilcox merged into the Tenneco Oil Company.  [*Motion*, ₱ 15].  In late 1996, Tenneco's parent was acquired by and became a subsidiary of the El Paso Natural Gas Company.  [*Id.* ₱ 17].  At that time, Tenneco's name was changed to EPEC Oil Company ("EPEC").  [*Id.*].

8.     In the spring of 1998, Ecology and Environment, Inc.—a contractor for USEPA—began work on a *Site Assessment Report for Wilcox Refinery Bristow, Creek County, Oklahoma*. [Exhibit 12].  As part of the investigation for the *Site Assessment*, Ecology and Environment contacted landowners then living on the Wilcox Site.  [*See id.* at 14139].  In March 1998, at least one landowner on the Wilcox Site reported that he (in concert with the Tenneco Oil Company) had "conducted some remediation at the site including bulldozing soil over oily waste at the surface within tank berms, at Pond 1, and on the oily waste 'Pit.'  ***The heavy equipment and operators were apparently provided by Tenneco Oil Company***."  [*Id.* at 14139 (emphasis added)].

9.     In December 1998, EPEC was purportedly dissolved pursuant to § 281(b) of the Delaware Corporation Law.  [*Motion*, 18].  As part of the dissolution process, EPEC executed an *Amended and Restated Plan of Distribution* and a *Liquidating Trust Agreement* that first stripped and distributed to the parent of EPEC a $93 million account receivable and then placed the remainder of EPEC assets into the EPEC Oil Co. Liquidating Trust (the "Trust") pursuant to the *EPEC Oil Company Liquidating Trust Agreement*.  [*Motion*, Exhibit 14; *Motion*, Exhibit 15 at 2].

10.     In 2012, Kinder Morgan merged with El Paso Natural Gas Company's parent, El Paso Corporation, and Kinder Morgan is the surviving entity. [*Motion*, 22, Exhibit 17 at 2].

### C.     USEPA Identifies Kinder Morgan as a Potentially Responsible Party.

11.     In May 2014, a USEPA contractor responsible for identifying potentially responsible parties for the Wilcox Site identified EPEC as a "liable company" for Wilcox obligations related to the Superfund site. [Exhibit 22 at 23]. More recently, in March of 2018, USEPA sent Kinder Morgan a letter "to notify Kinder Morgan, Inc. of its potential liability at the Wilcox Oil Superfund Site." [Exhibit 23].

### D.     The Church and Evans Family Learn of Contamination in July 2013.

12.     The contamination on the Wilcox Site, which consists of (among other things) heavy metals, lead, arsenic, hydrocarbons, and other substances within the soil, is generally latent and not readily discoverable to those who are not environmental professionals. [*See* Exhibit 5 at 6]. Defendants have deposed five members of the Church (including four pastors) in an effort to prove that the Church knew or should have known about the latent contamination alleged before June of 2013. But, all five deponents were uniform in their insistence that while concrete foundations and scattered pipe evidenced past industrial activity on the Church property, they did not know and had no reason to know of the massive, latent contamination in the soil and groundwater under the Church property.

13.     Terry Dorsey (pastor from 1984 through 1987) testified during his deposition that he was aware of concrete formations and exposed piping from former industrial operations, but that he had "no working knowledge" that the property had been impacted by historical refinery operations. [Exhibit 19 at 60:1-10; 62:5-12]. Mr. Dorsey repeatedly testified that he did not see any active seepage while on the property and that he did not see any evidence of dumping on the property. [*Id.* at 71:21-23; 79:6-14]. Mr. Dorsey also testified that while the runoff from the

property appeared to have a sheen, the sheen was no different from low-lying lands elsewhere in Oklahoma—and no different from the sheen commonly seen on runoff from asphalt roads. [*Id.* at 84:7-15; 93:9-94:25]. In short, "there was no knowledge . . . of any of the ailments of the property" and "no knowledge at that point of danger . . . ." [*Id.* at 112:17-25; 119:8-24].

14.     Johnny Dale Floyd (pastor from 1991 through 1995) testified that during the time in which he was pastor, he inquired about apparent oil seeps on the property, and requested a site visit by ODEQ. [Exhibit 17 at 10:1-4]. ODEQ made a site visit, Mr. Floyd showed ODEQ where on the site he had found oil seeps, and ODEQ told Mr. Floyd that ODEQ did not "see anything that you need to be concerned about." [*Id.* at 10:1-24; 13:23-25; 46:9-47:4; *see also* 50:16-51:21]. Mr. Floyd recounted his conversation with ODEQ as follows:

> After—after we walked around, it was kind of cool that day, and we went into the house. And that's where my wife was, and we visited for a while. And I asked him the question, should we be worried? What do I do? He said, at this time, I would do nothing. And he said, I don't think there's anything to be worried about. I don't—he said, I don't see anything that you need to be concerned about.

[*Id.* at 46:16-23]. Trusting the assessment of ODEQ, Mr. Floyd did not further investigate the matter. Members of the Church attributed the oil seeps to natural causes. [Exhibit 16 at 166:11-14 ("They just thought maybe there was . . . oil coming up out of the ground like anywhere else in Oklahoma.")].

15.     Doug Sampley (pastor from 1995 through 2007) testified that he had no knowledge of investigations, sampling, or work performed by ODEQ or USEPA on the property. [Exhibit 20 at 67:22-68:2; 79:7-88:16]. Mr. Sampley testified that he did not recall any stained soil, runoff with a sheen, or any foreign material seeping into the Sand Creek (which lies to the extreme west of the Wilcox Site and Church property). [*Id.* at 71:4-15; 91:12-16]. In fact, Mr. Sampley testified that he did not recall seeing any "spot that looks contaminated to me." [*Id.* at 71:4-5]. Mr. Sampley

did recall seeing areas where the grass did not grow on the Church property, but believed that concrete foundations or rock at or near the surface were the cause. [*Id.* at 70:22-25; 92:16-21; 100:19-22].

16.     Dale Allen is a plumber who has attended the Church since June 1986. [*Motion*, ¶ 47].  During his deposition, Mr. Allen flatly and consistently denied that he knew that there were any abnormal issues with the Church property.  Mr. Allen drew a sharp distinction between visible concrete and leftover pipe and knowledge of a significant environmental harm:

> It's Oklahoma.  And as a plumber, you run into all kinds of things.  Whenever people build sites and stuff like that, you run into all kinds of things.  And as far as I know, these things had nothing to do with any – towards contamination of the property or what it was.  I had no idea what they were.

[Exhibit 18 at 133:24-135:3].  In fact, in Mr. Allen's view, the Wilcox Site appeared to be "a normal site in Oklahoma you find." [*Id.* at 138:17-21].  Mr. Allen also disclaimed knowledge that the visible concrete and pipe were from refinery operations. [*Id.* at 77:4-79:1 ("I didn't know what they were from."); 136:3-14 ("I don't know what was built on the property."); 181:21-182:9 ("We didn't even know that that was on—had been on the property until Brother Evans brought all of that out.")]  Mr. Allen also testified that the Church did not "come across any oily soil or debris" during the construction projects in which he took part, that he was unaware of the numerous former tar pits on the Church property, that the only oil sheens he saw on the property were similar to those common in runoff from asphalt streets, and that the stains he saw on the ground of the Church property were similar to those he sometimes sees deer hunting in the wilderness. [*Id.* at 57:1-4 (no oily soil); 80:4-6 (no knowledge of former tar pits); 194:14-20 (oil sheens appear as if from asphalt); 133:24-135:3 (stains similar to those seen deer hunting)].

17.     Mark Evans (pastor from 2012 through present) testified during his deposition that he did not know that the Church property had formerly been used for refinery operations and that

he had no inclination that there had been a prior industrial use of the property.  [Exhibit 16 at 51:5-7; 56:1-7].  Mr. Evans testified that prior to July 2013 he was not aware of any buried foundations, structures, piping, or waste on the property.  [*See id.* at 81:2-12].  Mr. Evans testified that he was not aware of any areas on the Church property where grass would not grow, but noticed what he thought was gray rock outcropping in the backyard.  [*Id.* at 56:8-19; 59:14-60:5].

18.    In the spring of 2013, Mr. Evans' son and a friend were playing in the Sand Creek and came back to the parsonage with a black material covering their shoes.  [*Id.* at 57:12-58:24].  Mr. Evans followed his son to the creek and noticed that translucent oily or soapy materials were on the top of the water.  [*Id.*].  Mr. Evans told his son not to play in the creek anymore because there might be a problem with the creek.  [*Id.*].  Mr. Evans did not identify the cause of the soapy substance and thought that someone may have been dumping in the creek.  [*Id.* at 88:24-89:8].

19.    In approximately May of 2013, the Evans children were playing with a hose outside and smeared a sticky substance on their faces that was difficult to remove.  [*Id.* at 94:14-97:1].  The sticky substance was distinctly different from the translucent substance found by the creek.  [*Id.* at 96:16-97:3].  At the time, Mr. Evans thought that a tractor might be leaking oil into the backyard.  [*Id.* at 89:22-90:2].

20.    Around the same time period, Mr. Evans saw a television commercial from the Oklahoma Energy Resources Board ("OERB"), which caused him to call and inquire whether OERB could visit the property.  [*Id.* at 66:14-67:9].  OERB referred Mr. Evans to the Oklahoma Corporation Commission, which visited the property, noted that additional investigation was necessary, and referred Mr. Evans to ODEQ.  [*Id.* at 73:18-74:14; 78:4-8].  A meeting at the Church property with ODEQ, USEPA, and Mr. Evans occurred on July 2, 2013, at which point representatives from ODEQ and USEPA disclosed, in general, that serious contamination existed

on the Church property and that Mr. Evans should "get [his] family off this property." [*Id.* at 119:15-122:12]. Mrs. Evans and the children moved from the parsonage that night and Mr. Evans followed the next day. [*Id.*].

21.     This lawsuit was filed on June 24, 2015. [*Motion*, ¶ 24].

## III.     LEGAL STANDARD AND SUMMARY JUDGMENT EVIDENCE

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.*

In support of this *Response*, Plaintiffs rely on the pleadings and papers on file with the Court and respectfully request that the Court take judicial notice of the same. Additionally, Plaintiffs submit the following summary judgment evidence, which is fully incorporated herein by reference for all purposes:

Exhibit 1        Declaration of Mark Evans

Exhibit 2        Declaration of Dr. Robert Harrison

Exhibit 3        Expert Report of Dr. Robert Harrison

Exhibit 4        Declaration of Gerald Wollaston

Exhibit 5        Expert Report of Gerald Wollaston

Exhibit 6        Declaration of J. Berton Fisher

Exhibit 7        Expert Report of J. Berton Fisher

Exhibit 8        Wilcox Process Area Geologic Cross Section A-A'

Exhibit 9        Declaration of Rick Carlile

Exhibit 10        Expert Report of Dr. Rick Carlile

Exhibit 11      Declaration of Mike Blaschke

    Exhibit 12      March 1999 Site Assessment Report for Wilcox Refinery Bristow, Creek County, Oklahoma

    Exhibit 13      July 28, 2014 Special Notice Letter for the Wilcox Oil Superfund Site, Bristow, Creek County, Oklahoma

    Exhibit 14      Site Inspection Report Lorraine Refinery

    Exhibit 15      Preliminary Assessment of the Wilcox Oil Company

Exhibit 16      Deposition Transcript Excerpts of Mark Evans

Exhibit 17      Deposition Transcript Excerpts of Johnny Dale Floyd

Exhibit 18      Deposition Transcript Excerpts of Dale Allen

Exhibit 19      Deposition Transcript Excerpts of Terry Dorsey

Exhibit 20      Deposition Transcript Excerpts of Doug Sampley

Exhibit 21      Deposition Transcript Excerpts of Todd Downham

Exhibit 22      May 16, 2014 Draft Title Search and Corporate History Report for the Wilcox Oil Superfund Site

Exhibit 23      March 27, 2018 General Notice Letter for the Wilcox Oil Refinery Superfund Site Bristow, Creek County, Oklahoma

Exhibit 24      Wilcox Oil Company 2012 Aerial Photograph

Exhibit 25      Wetland Delineation Report

Exhibit 26      March 16, 2015 Wilcox Superfund Site Enhanced Corporate and Operational History Report

Exhibit 27      April 8, 2014 Wilcox Oil Superfund Site Draft Title Search Report

Exhibit 28      February 19, 1997 ODEQ Memorandum Regarding Potentially Responsible Party (PRP) Search and Current Ownership of the Property

Exhibit 29      Deposition Transcript Excerpts of Mark Ehrman

Exhibit 30      Transcontinental Tank Site Lease

Exhibit 31        Deposition Transcript Excerpts of Douglas Reinhart

Exhibit 32        Defendant BP p.l.c. Preliminary Witness List

Exhibit 33        September 19, 2014 Correspondence from BP Legal to USEPA

Exhibit 34        July 28, 2014 Correspondence from USEPA to BP Corporation

Exhibit 35        July 28, 2014 Correspondence from USEPA to Atlantic Richfield Company

Exhibit 36        Standard Oil Tank Site Leases

Exhibit 37        Sinclair Pipe Line Company to BP Pipelines (North America), Inc.

Exhibit 38        Sinclair Refining Company to Atlantic Richfield Company

Exhibit 39        BP America Inc. Legal Structure

Exhibit 40        Remediation Management Defined Practice

Exhibit 41        Deposition Transcript Excerpts of Christina Evans

Exhibit 42        Deposition Transcript Excerpts of James Tack

## IV.    LEGAL ARGUMENT

Kinder Morgan's legal arguments either misstate applicable law or request that the Court resolve factual disputes against Plaintiffs.

### A.    Wilcox Liabilities Extend to Kinder Morgan.

The primary legal argument advanced by Kinder Morgan rests on three contentions:  (1) that the dissolution and Trust discharged all EPEC liability related to the Wilcox Site; (2) that the EPEC dissolution process complied with Delaware law; and (3) that no evidence to support corporate veil piercing exists.  All three contentions must be correct in order for Kinder Morgan to succeed on its *Motion*, but all three are wrong.

#### i.    *The dissolution and Trust do not discharge Wilcox liabilities.*

Kinder Morgan suggests that EPEC liabilities related to the Wilcox Site were discharged through the dissolution process established in § 281(b) of the Delaware General Corporation Law.

Kinder Morgan's argument is directly contrary to established Delaware law (which Kinder Morgan asserts applies to the corporate law issues in this case). *See In re Kraft-Murphy Co. Inc.*, 82 A.3d 696 (Del. 2013).[1]  The 10 year claims planning period in the Delaware dissolution statute ensures that dissolving corporations *plan ahead for future claims*; the planning period does not require that claims be brought within 10 years.

The Supreme Court of Delaware discussed this exact issue in its exhaustive 2013 opinion in *Kraft-Murphy*.  82 A.3d 696.  In *Kraft-Murphy*, the corporation at issue began the process of dissolving under Delaware law after being "named as a defendant in hundreds of asbestos-related personal injury lawsuits."  *Id.* at 698.

> The Corporation ceased operations in 1991, and in 1999 it formally dissolved, pursuant to 8 Del. C. § 275.  The Corporation did not elect to notify creditors of its dissolution under the procedure set forth in 8 Del. C. § 280.  Nor did the Corporation make any provisions for claims of future creditors and claimants, utilizing the procedure set forth in 8 Del. C. § 281(b).

*Id.* at 699.  Likewise, here, there is no dispute that EPEC did not elect to notify creditors of its dissolution under the procedure set forth in § 280, and that EPEC instead chose to proceed with dissolution utilizing the procedure set forth in § 281(b).  [*Motion*, 17-18].

In *Kraft-Murphy*, "the Corporation began filing motions in other courts to dismiss asbestos-related claims commenced more than ten years after its dissolution . . . the Court of Chancery held that claims filed more than ten years after the date of dissolution were time-barred and should be dismissed."  82 A.3d at 699.  The Supreme Court of Delaware *reversed*, holding instead that §§ 280-282 *do not* "operate to cut off a dissolved corporation's liability."  *Id.* at 705.  In discussing its holding, the Court addressed the 10 year claims planning period, and expressly rejected the

---

[1] A copy of this, and all other non-published or foreign jurisdiction opinions are attached hereto as <u>Exhibit 44</u>.

contention that the claims planning period operated as a time-bar. *Id.* at 706 ("Nor do the five and ten year claims planning periods outlined in §§ 280(c)(3) and 281(b) operate more broadly to extinguish a dissolved corporation's liability. By concluding otherwise, the Court of Chancery misread those statutes.").

The Supreme Court of Delaware noted that the ***only*** two circumstances in which the Delaware dissolution statute operates to time-bar claims are when claims are presented and rejected by the dissolving corporation and "where a known, existing claimant, who was given actual notice by the dissolving corporation as prescribed . . . fails to present the claim to the corporation . . . ." *Id.* at 706. And, Kinder Morgan does not allege that either of these two circumstances apply here.

Delaware law is clear: The Delaware dissolution statute and the Trust do not operate to time-bar claims, including those brought by Plaintiffs.

### ii. *The EPEC dissolution did not comply with Delaware law.*

Kinder Morgan repeatedly asserts that the EPEC dissolution complied with Delaware law, but does not actually demonstrate compliance. [*Motion*, 17-18]. Instead, the summary judgment evidence demonstrates that the dissolution ***did not*** comply with Delaware law because EPEC did not make provision to pay all existing claims and obligations known to EPEC. [Exhibit 12; *Motion*, Exhibit 15].

Section 281(b)—through which EPEC purportedly dissolved—requires that plans of distribution comply with three simple requirements. Specifically, a plan of distribution must reasonably provide for: (1) ***all existing claims and obligations known to the corporation***; (2) any suits pending against the corporation; and (3) claims that are likely to arise or become known to the corporation or successor entity within 10 years after the date of dissolution. In its *Motion*, Kinder Morgan argues at length that the establishment of the Trust (which, by its own terms, only

addressed post-dissolution liabilities) satisfied the third requirement, without discussing EPEC's purported compliance with the first requirement in any detail.  [*Motion*, 18].

The summary judgment evidence, at minimum, raises a fact question regarding whether Tenneco (and therefore EPEC) had knowledge of existing claims and obligations related to the Wilcox Site at the time of dissolution.  [*See* Exhibit 12; *see also Motion*, Exhibit 24 at 5 (identifying Tenneco as a successor to Wilcox liabilities in what Kinder Morgan characterizes as a 1994 "published . . . government report")].  Given that the summary judgment evidence indicates that Tenneco (and therefore EPEC) provided bulldozers and operators to "remediate" (*i.e.*, cover over with dirt and bury) visible surface contamination at the Wilcox Site, the jury may infer that Tenneco (and therefore EPEC) had knowledge of contamination and claims related to the Wilcox Site prior to dissolution.  But, the Trust Agreement does not make any provision to pay the existing claims and obligations related to the Wilcox Site, and Kinder Morgan does not identify any other means by which EPEC made provision for payment.  [*See Motion*, Exhibit 15].

Proper dissolution of a corporation under Delaware law insulates directors and owners of dissolved corporations from liability to claimants of the dissolved corporation.  *Kraft-Murphy*, 82 A.3d at 706 (citing 8 Del. C. §§ 281-82).  Here, where EPEC did not make provision to pay claims and obligations related to the Wilcox Site (which EPEC knew existed before the time of dissolution), no such protection inures.  And, Kinder Morgan admits in its *Motion* that Kinder Morgan acquired EPEC's ultimate parent (El Paso) in 2012.  [*Motion*, 15].  Further, because the 2012 El Paso acquisition was by merger, there can be no legitimate dispute that Kinder Morgan has succeeded to the liabilities of El Paso.  [*See Motion*, Exhibit 17 at 2; *see also Opinion and Order* [Dkt. 206] ("Both matters involve the alleged contamination of the Wilcox site by the former

Wilcox Company, which merged with Tenneco Oil Company in 1965. ***El Paso is the successor to Tenneco and Kinder-Morgan acquired El Paso in May 2012***.") (emphasis added)[2]].

### iii.        *The summary judgment evidence supports veil piercing.*

Plaintiffs do not require veil piercing to succeed on their claims.[3]   However, Plaintiffs affirmatively plead veil piercing to the extent necessary, and as an alternative route to recovery. As Kinder Morgan notes in its *Motion*, under Delaware law a corporate veil may be pierced where plaintiffs "show that the interests of justice require [the piercing of the corporate veil] because matters like fraud, public wrong, or contravention of law are involved." [*Motion*, 17 (citing *BASF Corp. v. POSM II Props. P'ship, L.P.*, No. 3608-VCS, 2009 WL 522721, at *8 n. 50 (Del. Ch. Mar. 3, 2009)); *Outokumpu Engineering Enterprises, Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del. Ch. 1996) ("the alter ego theory requires that the corporate structure cause fraud or similar injustice.")].

The summary judgment evidence demonstrates both public wrong and contravention of law.  Plaintiffs have alleged that the pollution and contamination resulting from historical activities on the Wilcox Site create a public nuisance, which the public, through USEPA, ODEQ, and other agencies, must manage and remediate.  Through this lawsuit, Plaintiffs seek, among other things,

---

[2] This Court's October 11, 2018 *Opinion and Order* was in response to Kinder Morgan's *Motion to Disqualify Plaintiffs' Counsel*, in which Kinder Morgan argued that Mr. Kerney's prior representation of "El Paso" should disqualify him from a position adverse to Kinder Morgan related to the Wilcox Site. [Dkt. 178].  Kinder Morgan recognized in its disqualification argument that the standard for disqualification requires an "attorney-client relationship . . . between the moving party [*i.e.*, Kinder Morgan] and the opposing counsel." [*Id.* at 12].  Kinder Morgan cannot now backtrack the arguments relied on by the Court in disqualifying Drubin, Larimore, & Bialick, PC (*i.e.*, that El Paso is the successor to Tenneco and Kinder Morgan acquired El Paso).

[3] While Kinder Morgan suggests that veil piercing is extraordinarily difficult, if not impossible, under Delaware law, scholarly studies of the issue suggest the opposite:  34.29% of veil-piercing claims are successful in Delaware, and over 21% of veil-piercing litigants are successful against corporate parents.  *See* Peter B. Oh, *Veil-Piercing*, 89 Tex. L. Rev. 81, 116 (2010).

an order requiring Defendants to abate the nuisance they and their predecessor corporations caused (and for which Defendants are now liable through merger or acquisition) so as to remedy the public wrong committed. And, there is case law that supports piercing the corporate veil to prevent unfunded CERCLA liabilities. *See, e.g.*, *Carter-Jones Lumber Co. v. LTV Steel Co.*, 237 F.3d 745 (6th Cir. 2001) (holding that the corporate veil may be pierced to further the goals of the CERCLA statutory scheme); *U.S. v. Kaysar-Roth Corp.*, 272 F.3d 89, 102 (1st Cir. 2001); *see also* Jonathan Macey & Joshua Mitts, *Finding Order in the Morass: The Three Real Justifications for Piercing the Corporate Veil*, 100 Cornell L. Rev. 99 (2014) (noting that Sixth Circuit in *Carter-Jones* "correctly in our view, expressly disregard[ed] various traditional elements of veil piercing—*e.g.*, failing to observe corporate formalities and holding oneself out as personally liable for the corporations' debts—in order to further the goals of the CERCLA statutory scheme.").

Piercing the corporate veil is also proper where contravention of law is involved. Here, Plaintiffs allege that EPEC did not comply with the Delaware dissolution statute because the plan of distribution did not reasonably make provision to pay existing claims and obligations known to EPEC at the time of dissolution (including existing claims and obligations related to the Wilcox Site). Instead, the corporate parents of EPEC siphoned off company funds contemporaneously with dissolution in the amount of $93 million, which is sufficient grounds for piercing the corporate veil under Delaware law. *See, e.g.*, *Winner Acceptance Corp. v. Return on Capital Corp.*, No. 3088-VCP, 2008 WL 5352063, at *5 (Del. Ch. Dec. 23, 2008); *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 556 (Bankr. D. Del. 2012).[4]

---

[4] In addition, Plaintiffs incorporate by reference their explanation of the Kinder Morgan-El Paso merger (and why it supports veil-piercing) in *Plaintiffs' Objections to the Court's Jurisdiction and Response in Opposition to Defendant Kinder Morgan's Motion to Dismiss and Brief in Support* [Dkt. 29] (and the exhibits referenced therein).

Moreover, while Kinder Morgan mocks Plaintiffs' allegations as nothing short of a conspiracy theory—"a muddy swirl of corporate cover-ups, shell-games and shams aimed at improper avoidance of EPEC Oil's historical liabilities"—it is significant to note that USEPA, the federal agency charged with enforcement of the nation's environmental clean-up laws, has drawn a similar conclusion to Plaintiffs and has issued a letter "to notify Kinder Morgan, Inc. of its potential liability at the Wilcox Oil Superfund Site."  [*Compare Motion*, 15 *with* Exhibit 23].

At minimum, Plaintiffs have raised a fact issue regarding whether the corporate veil should be pierced in this case, and therefore the Court should submit the issue to the jury.  *See Gish v. ECI Serv. of Okla., Inc.*, 162 P.3d 223, 234 (Okla. 2006) (issue of whether to pierce corporate veil "doubtless gives rise to a fact question."); Okla. Const. art. II, § 19.

### B.    Limitations Does Not Defeat Plaintiffs' Claims.

Preliminarily, Kinder Morgan's limitations argument cannot succeed as to C.J.E. and B.K.E. (who were minors when this case began).  Kinder Morgan's limitations argument fails as to Mark Evans, Christina Evans, and the Church because fact issues exist concerning when Plaintiffs knew or should have known of:  the contamination on the Wilcox Site; the causal connection between the contamination and Defendants' activities; and the public nuisance giving rise to this litigation.  Further, Kinder Morgan's limitations argument fails as a matter of law because limitations does not apply to public nuisance in Oklahoma.

The central question in deciding whether the statute of limitations has expired . . . is when [Plaintiffs] knew or should have known that [they] suffered injury."  *Woods v. Prestwick House, Inc.*, 247 P.3d 1183, 1191 (Okla. 2011).  "Whether an action is barred by the applicable statute of limitations ***is a question of fact*** to be determined by considering the evidence in each case."  *Miller v. Glaxosmithkline*, No. 03-CV-393 K (J), 2005 WL 8174802, at *2 (N.D. Okla. Jan. 27, 2005) (Kern, U.S.D.J.) (emphasis added).  "The statute begins to run, and the cause of action accrues

when a litigant first could have maintained his action to successful conclusion." *Id.* (internal quotations omitted).

Oklahoma case law has recognized that in actions involving pollution, the limitations period does not begin until the damage or injury becomes apparent to the injured party. *See Sherwin-Lecas v. ConocoPhillips Co.*, No. CIV-08-1098, 2010 WL 11509175, at *5 (W.D. Okla. Mar. 22, 2010); *Sloan v. Canadian Valley Animal Clinic, Inc.*, 719 P.2d 474, 475 (Okla. 1985); *see also Continental Oil Co. v. Williams*, 250 P.2d 439, 503 (Okla. 1952) ("It is fundamental that the statute of limitation did not begin to run until the damage was apparent and this brought the damages complained of within the two year limitation.").

### i.      *Summary judgment cannot resolve factual disputes.*

Here, Plaintiffs have testified that they did not know the condition of the Church property until the July 2, 2013 meeting with USEPA and ODEQ (the "July 2013 Meeting"). [Exhibit 16 at 119:15-122:12].   Kinder Morgan argues that Plaintiffs knew or should have known about the contamination prior to June 24, 2013 (two years before suit was filed).  [*Motion*, 6].

However, Kinder Morgan's argument that Plaintiffs *did* know of contamination prior to June 24, 2013 creates a factual dispute in view of Plaintiffs' assertions to the contrary—and the factual dispute cannot be disposed of through summary judgment. *See Davis v. Shell Oil Co.*, 795 F.Supp. 381, 385 (W.D. Okla. 1992) ("Defendants assert that plaintiffs knew of the nuisance more than two years prior to that date.  In opposition, plaintiffs assert that they were first informed of a possible pollution of their water well in September, 1989, and confirmed salt contamination in October, 1989. ***These allegations alone preclude summary judgment on limitations grounds***.") (emphasis added); *North v. Evans*, 185 P.2d 901, 904 (Okla. 1947) (upholding submission of special interrogatory to the jury regarding limitations where the plaintiff testified that pollution began killing trees outside the limitations period, but that the bulk of the trees died within the

limitations period); *Skelly Oil Co. v. Humphrey*, 158 P.2d 175 (Okla. 1945) (refusing to apply limitations on similar facts to *Humphrey*); *Harper-Turner Oil Co. v. Bridge*, 311 P.2d 947, 950 (Okla. 1957) ("We are of the opinion that the question of when it became apparent to plaintiffs or would have been apparent to a reasonable person under the circumstances, that the injury and damage to their water well was permanent, was a question of fact which the trial court properly submitted to the jury . . . ."); *McAfee v. Duke Energy Field Services, L.P.*, CIV-05-672-C, 2005 WL 8157799, at *2 (W.D. Okla. Oct. 25, 2005) (finding fact question as to when contamination from refinery operations became apparent).

### ii.   *The discovery rule tolled the start of limitations until at least July 2, 2013.*

Kinder Morgan asserts in its *Motion* that the discovery rule applies in this case.  [*Motion*, 20].  The U.S. Court of Appeals for the Tenth Circuit has summarized the discovery rule in Oklahoma as preventing the commencement of the limitations period "until the plaintiff knows, or as a reasonably prudent person should know, that he has the condition for which his action is brought ***and*** that the defendant caused it."  *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013) (emphasis added).  Further, the discovery rule encompasses the principle that, for limitations to begin, the plaintiff must possess sufficient information which, "if pursued," would lead to the discovery of the "true condition of things."  *Lovelace v. Keohane*, 831 P.2d 624, 630 (Okla. 1992).

Kinder Morgan's argument that Plaintiffs knew or should have known about the condition of the Church property prior to the July 2013 Meeting is without merit.  Kinder Morgan argues that the contaminated water well on the Church property and oil seeps seen by Mr. Floyd should have given the Church notice of contamination as far back as the 1990s.  [*Motion*, 8-9].

However, knowledge of oil seeps and oil in groundwater/surface water is not knowledge of injury.  Mr. Evans testified that the Church thought that oil was "coming up out of the ground like anywhere else in Oklahoma," a contention echoed by Mr. Allen, who testified that the runoff

and stains he saw on the Church property were no different than what he regularly sees in the wilderness while deer hunting (and that the runoff and stains alone did not raise the probability of unnatural contamination).  [Exhibit 16 at 166:11-14; Exhibit 18 at 133:24-135:3].  Other federal courts have long-cautioned against the assumption that oil seeps automatically mean pollution in areas of the country where oil is frequently at or near the surface.

> Closer inspection revealed black deposits on stones in the stream which, when disturbed, generated a rainbow sheen on the water, characteristic of oil contamination.  Oil in streams . . . is not uncommon, and not always unnatural.  Natural seepage from subterranean oil deposits has leaked into these streams for hundreds of years.  Indians skimmed oil from the surface of streams for religious and medicinal purposes.  The sheen of oil on the water first attracted the embryonic oil industry in the 19th Century and the natural contamination of streams still occurs today.

*Quaker State Corp. v. U.S. Coast Guard*, 681 F.Supp. 280, 282 (W.D. Pa. 1988).

Further, these facts would have begun the limitations period only if they constituted "sufficient information which, if pursued, would lead to the true condition of things."  *See Lovelace*, 831 P.2d at 630.  Here, however, the summary judgment evidence establishes that the Church *did* pursue the information and the information *did not* lead to the true condition of things.  Specifically, the evidence is uncontroverted that Mr. Floyd arranged for a site visit with ODEQ, showed the agency the well and seeps—**and that ODEQ told Mr. Floyd there was nothing to worry about**.  [Exhibit 17 at 10:1-24; 13:23-25; 46:9-47:4; *see also* 50:16-51:21].  Mr. Downham, who is currently the ODEQ contact for the Wilcox Site, gave testimony that is generally consistent with Mr. Floyd's testimony; specifically, that after reviewing the Church property and Wilcox Site in the 1990s, ODEQ decided *not* to proceed with a cleanup, and that the Wilcox Site subsequently returned to ODEQ's "radar because of newer developments in the east tank farm" and because of concern from local citizens in the 2008 time frame.  [Exhibit 21 at 102:3-103:19].  Also, there is no indication that these facts from the 1990s can bar the Evans Family personal injury claims,

because (among other reasons) the Evans Family did not begin living at the parsonage until 2012 and because Mark Evans testified that he had no knowledge of facts stemming from the 1990s previous to the July 2013 Meeting.  [Exhibit 16 at 200:19-201:7-14].

Kinder Morgan's attempt to subvert the discovery rule fails for another important reason.  Specifically, the Tenth Circuit has held that the discovery rule tolls limitations "until the plaintiff knows, or as a reasonably prudent person should know . . . *that the defendant caused*" the condition.  *See Schrock*, 727 F.3d at 1280 (emphasis added).  In other words, when the discovery rule applies, the limitations period does not commence until the "causal connection" between the injury and the defendant's conduct is discovered.  *See Miller*, 2005 WL 8174802, at *2.  Aside from vague references to Plaintiffs' knowledge that the Church property was formerly used as a refinery or for other industrial activities, the *Motion* does not even argue that a causal connection between the drinking water well contamination or oil seeps and the former refining activities on the Wilcox Site was established until the July 2013 Meeting.  Just as significantly, Mark Evans testified that he thought that the cause of the Sand Creek incident was dumping and that the cause of the trampoline incident was leaking motor oil.  [Exhibit 16 at 88:24-89:8; 89:22-90:2].  The summary judgment record does not establish that the Church or Evans Family established any causal connection before the July 2013 Meeting.

Defendants' limitations argument becomes even more tenuous when consideration is given to the fact that contamination migrated between parcels and operational areas on the Wilcox Site.  [Exhibit 6; Exhibit 7 at 14].  Prior to USEPA and ODEQ involvement in 2013, there was no reasonable method for Plaintiffs to discover a causal nexus between the contamination and Wilcox Site operational areas to the east of the Church property.

This Court recognized the significance of the "causal connection" with respect to the discovery rule in *Miller*. 2005 WL 8174802, at *2. In *Miller*, the plaintiff attempted to commit suicide in 1998 and was struck by oncoming traffic. *Id.* at *1. In 2001, the plaintiff discovered that a Wyoming jury found that a prescription drug taken by the plaintiff caused certain individuals to become homicidal and/or suicidal. *Id.* The plaintiff brought suit against the drug company in 2003. *Id.* The defendant pleaded limitations, and specifically argued that the discovery rule did not apply because the "injury was immediately apparent." *Id.* at *2 The defendant also noted that inadmissible scientific studies and articles discussing the possible link between the drug and suicide were available "throughout the 1990s." *Id.* at *3. While noting that "the question of when Plaintiffs should have discovered the cause of [the Plaintiff's] injuries would normally be a question of fact for the jury" this Court found that the summary judgment record demonstrated that the plaintiffs "first acquired sufficient information about the connection" between the drug and suicide in 2001 and ***granted summary judgment for the plaintiff on limitations***. *Id.* at *4.

Likewise, here, Kinder Morgan argues that Plaintiffs' injuries were readily apparent (a fact Plaintiffs contest) and that studies concerning the contamination were available but not found by Plaintiffs until years after the fact. [*Motion*, ¶¶ 35-40]. However, the summary judgment record does not establish as a matter of law that Plaintiffs drew a causal connection between any contamination and the refinery operations, or that Plaintiffs were negligent in failing to do so.

Kinder Morgan attempts to cure the "causal connection" defect in its limitations argument by contending that *Tomlinson v. Combined Underwriters Life Ins. Co.*, No. 08-CV-259-TCK-FHM, 2009 WL 2923010, at *4 (N.D. Okla. Sept. 9, 2009) prohibits the tolling of the limitations period until the plaintiff knows or should know that the defendant caused the condition. [*Motion*, 21 n. 5]. In *Tomlinson*, the Court declined to apply the discovery rule to toll limitations where the

plaintiff sued the wrong corporate entity, and where the identity of the correct corporate entity was readily available. *Id.* ("Notably, Plaintiff does not provide, nor could the Court find, Oklahoma authority applying the discovery rule to the late discovery of a parent company of a named defendant . . . ."); *see also Wells v. Lowe's Home Centers, Inc.*, No. 06-CV-150-JHP, 2008 WL 2783161, at *2 (N.D. Okla. July 15, 2008) (declining to apply discovery rule where "the injured party knows they have been wrongfully injured, has identified the product that caused the injury, and has identified the designer, distributer, and seller of that product, but has not identified the actual manufacturer of the product."). Here, Plaintiffs do not seek to toll limitations for purposes of finding the correct corporate entity to sue, but rather because the nature of the injury was such that Plaintiffs did not know of the causal connection between their injuries and Defendants' conduct until (at least) the July 2013 Meeting. *See Miller*, 2005 WL 8174802, at *2.

### iii.    *Knowledge of refining operations did not begin the limitations period.*

Oklahoma courts have also rejected the contention that knowledge of past industrial land uses (and continuing visible evidence of such uses) constitutes knowledge as a matter of law of contamination. *See N.C. Corff Partnership, Ltd. v. OXY USA, Inc.*, 929 P.2d 288, 294 (Okla. 1996). In *N.C. Corff*, the Oklahoma Court of Appeals flatly rejected the contention that where a property was previously used for oilfield operations, and where evidence of the past land use was visible, that the plaintiff had "undisputed" knowledge that would trigger the beginning of limitations as a matter of law:

> The type of harm that can result from exploration and production operations, and the extent to which a landowner reasonably should be expected to be aware of such consequences, is a fact issue that may even require testimony by experts to establish . . . ***We reject OXY's argument that Plaintiffs' knowledge of some contamination to some portions of the property over the years indisputably established, as a matter of law, that Plaintiffs possessed such information that should have caused them to reasonably inquire or further investigate contamination from OXY's oilfield operations***.

*Id.* at 294 (emphasis added) *see also Moneypenney v. Dawson*, 141 P.3d 549, 554 (Okla. 2006) (citing *N.C. Corff* favorably).

The core of Kinder Morgan's limitations argument is strikingly similar to the limitations argument expressly rejected in *N.C. Corff*.  Specifically, Kinder Morgan attempts to equate visible evidence of past refinery operations (which were permissible uses of the property by prior owners) with "undisputed" knowledge of massive, latent contamination.  "Undisputed" visual evidence of "stained soil, tarry residue and rock-like material, abandoned pipes, concrete foundations" and the like may equate to knowledge of previous permissible industrial uses of the land but they do not equate to "undisputed" knowledge of massive, latent contamination (the magnitude of which would place the Wilcox Site in the Superfund program).  [*Compare id. with Motion*, 21-22].  In fact, the *N.C. Corff* decision went so far as to hold that "knowledge of some contamination to some portions of the property" did not establish as a matter of law that limitations began.  929 P.2d at 294.  Therefore, even taking as true Kinder Morgan's contention that Plaintiffs knew of some contamination (a contention that is hotly contested by Plaintiffs)—knowledge of some contamination to some areas of the property does not establish limitations as a matter of law.  *See id.*

And, while Kinder Morgan cites Mr. Dorsey's testimony for the proposition that the Church "recognized the potential danger of these conditions, making the majority of the property off limits for use by Church members"—Mr. Dorsey's sworn testimony is entirely consistent with the common-sense principle that Church members did not want their children playing near abandoned industrial equipment, and ***not*** with the principle that Church members knew of massive, latent contamination:

Q. And -- and you -- the areas that you were urging that the staff make sure the kids avoid were the areas with the pipe, correct?

A. Anything behind the church was the rule.

Q. Okay.

A. Behind the church was off limits.

Q. And what were the –

A. Which was the majority of our land.

Q. Right. What were the issues behind the church that you were hoping the children wouldn't encounter?

A. Was the -- the jagged pipes –

Q. Uh-huh.

A. -- sticking out of the ground.

Q. Uh-huh.

A. The old concrete formations, that old well.

Q. Uh-huh.

A. Just those type of things.

[*Motion*, Exhibit 21 at 61:22-62:14].  Mr. Dorsey's testimony is consistent with that of Mark Evans, who testified that "they didn't know it was pollution.  They just saw pipes, They didn't see—they didn't know it was pollution."  [Exhibit 16 at 163:10-14].  Pipes and concrete foundations may give notice of past industrial uses of the property (which were not *per se* improper), but do not give notice of the massive pollution released by these industrial uses, which was improper.

### iv.        *Limitations does not apply to public nuisance.*

Kinder Morgan also requests that the Court revisit its prior determination that limitations does not apply to public nuisance.  [*Compare Motion,* 24 *with* Dkt. 283, p. 9].

Attempts to apply limitations to public nuisance actions seeking damages and/or abatement of an actual obstruction of a public right have been flatly rejected again and again by federal courts applying Oklahoma law:

> Plaintiffs' claims for property damage arise in part out of allegations that Defendant's plant constitutes a public nuisance.  50 Okla. Stat. § 7 provides that "[n]o lapse of time can legalize a public nuisance amounting to an actual obstruction of public right."   Defendant cites *Branch v. Mobil Oil Corp.*, 788 F. Supp. 531 (W.D. Okla. 1991), for the proposition that, rather than suspending operation of the statute of limitations, this provision instead "merely allows abatement or a civil action therefor as long as the nuisance exists."  *Id.* at 536.  Plaintiffs provide a conflicting case from the same court which indicates that the statute prevents the limitations period from running against a public nuisance. *Fischer v. Atl. Richfield Co.*, 774 F. Supp. 616, 619 (W.D. Okla. 1989). The issue was addressed by the Tenth Circuit in *Tosco Corp. v. Koch Industries, Inc.*, 216 F.3d 886 (10th Cir. 2000).  There, the Court found that a public nuisance existed and, according to 50 Okla. Stat. § 7 and Fischer, the statute of limitations did not run against a public nuisance.  The Court found "no reason to reject this existing interpretation of Oklahoma law."  *Tosco Corp.*, 216 F.3d at 895.  ***Based on the Tenth Circuit's reasoning, this Court finds that, to the extent that Plaintiffs' claims for property damage are found to arise out of the existence of a public nuisance, the statute of limitations would not bar their recovery. This includes claims for both permanent and temporary damages***.

*Ponca Tribe of Indians of Okla. V. Continental Carbon Co.*, No. CIV-05-445-C, 2008 WL 11338469, at *3 (W.D. Okla. Nov. 21, 2008); *see also*, *Davis v. Shell Oil Co.*, 795 F.Supp. 381, 385 (W.D. Okla. 1992) ("Additionally, plaintiffs argue that in Oklahoma, a public nuisance is not subject to a limitations period.  *See* Okla. Stat. tit. 50, § 7 ("No lapse of time can legalize a public nuisance . . .").  The Court agrees that this authority is controlling, and therefore that summary judgment on limitations grounds is inappropriate."); *Fischer v. Atlantic Richfield Co.*, 774 F.Supp. 616, 619 (W.D. Okla. 1989) ("the statute of limitations does not run against a public nuisance . . . Therefore, to the extent that ARCO's activities have polluted state waters, ARCO may not plead the statute of limitations as a defense."); *Blocker v. ConocoPhillips Co.*, 378 F.Supp.3d 1066, 1073 (W.D. Okla. 2019) ("Plaintiffs argue that the statute of limitations defense is inapplicable to claims

arising out of a public nuisance . . . Defendant does not challenge this authority . . . ."); *Blocker v. ConocoPhillips Co.*, 380 F.Supp.3d 1178, 1187 (W.D. Okla. 2019) ("Oklahoma authority dictates that public nuisances are not subject to a limitations period.").

Kinder Morgan attempts to avoid the persuasive effect of no less than ***five*** decisions from the Western District by arguing that the Western and Northern Districts have split on whether limitations applies to public nuisance.  [*Motion*, 25].  However, Kinder Morgan's briefing fails to establish any such split.  Instead, both Northern District cases that apply limitations to a claim for public nuisance did so because the plaintiff did "not allege any actual obstruction of a public right necessary for a public nuisance claim that has no statute of limitations." *See Evans v. Asarco, Inc.*, No. 04-CV-94-GKF-PJC, 2011 WL 1842775, at *3 (N.D. Okla. May 16, 2011); *Cole v. Asarco Inc.* No. 03-CV-327-GKF-TLW, 2011 WL 1667290, at *3 (N.D. Okla. May 3, 2011).

Okla. Stat. tit. 50, § 7 expressly provides that "[n]o lapse of time can legalize a public nuisance amounting to an actual obstruction of public right."  Of course, if a plaintiff does not demonstrate a public nuisance amounting to an actual obstruction of public right, the § 7 exclusion from limitations does not apply.  Plaintiffs here have demonstrated a public nuisance amounting to an actual obstruction of public right by (among other things) pleading facts and introducing evidence demonstrating that the nuisance at issue results in the pollution of navigable waters.  *See Tosco Corp. v. Koch Indust., Inc.*, 216 F.3d 886 (10th Cir. 2000) (pollution of navigable water public nuisance not subject to limitations).

There is no split between the Northern and Western Districts.  In the five cases in the Western District, the plaintiffs properly pleaded a public nuisance amounting to an actual obstruction of a public right.  In the two Northern District cases (which appear to be companion cases), the plaintiffs did not.

Finally, Kinder Morgan's reliance on *Tosco* is misplaced.  Kinder Morgan cites *Tosco* for the proposition that limitations applies to public nuisance actions for which damages are sought (again, despite *five* Western District cases holding that *Tosco* is not so limited).  [*Motion*, 24-25].  But, the plaintiff in *Tosco did* receive money damages in the form of 15% of the ***past and future*** remediation costs for the property at issue and therefore *Tosco* does not support Kinder Morgan's construction.  *See* 216 F.3d at 889, 897.

> ### v.        *Limitations could not begin until the damage was obviously permanent.*

Kinder Morgan asserts that Plaintiffs' real property damage claims are for permanent injury to land.  [*Motion*, 26 n.9].  It has long been the law in Oklahoma that the "period of limitations does not commence to run against a cause of action for permanent damage to realty until the damage is apparent and it becomes obvious that such damage is of a permanent character." *Harper-Turner Oil Co. v. Bridge*, 311 P.2d 947 Syll. Pt. 1 (Okla. 1957).  And, this case law was cited favorably by the Oklahoma Supreme Court as recently as 2016.  *See Calvert v. Swinford*, 382 P.3d 1028, 1034 n.30 (Okla. 2016).

Put concisely, it was certainly not "obvious" to Plaintiffs before the July 2013 Meeting that the Church property had suffered permanent damage.  [Exhibit 16 at 88:24-89:8; 89:22-90:2; 166:11-14].  Kinder Morgan attempts to subvert this long-standing Oklahoma law by citing the rule that the lack of knowledge that a ***personal injury*** is permanent does not toll limitations. [*Motion*, 21 (citing *Kang v. Kang*, 11 P.3d 218, 219 (Okla. Civ. App. 2000))].  But, Oklahoma law treats real property damages and personal injury damages differently in this respect.  *Compare Harper-Turner*, 311 P.2d 947 *with Kang*, 11 P.3d at 219.

### C.        Failure to Clean Up the Wilcox Site Constitutes a Tort.

Kinder Morgan also raises a hodgepodge of reasons why it believes it cannot be liable for contamination of the Wilcox Site.  Kinder Morgan's contentions are premised on two incorrect

assumptions:  (1) that a corporation cannot be liable for failing to clean up land it owns (despite clear Oklahoma law to the contrary); and (2) that a corporation cannot be liable for pollution that migrates from one tract to another (again, despite clear Oklahoma law to the contrary).

### i.        Kinder Morgan is liable for public nuisance.

Kinder Morgan's novel argument that only polluting activities (and not pollution itself) constitute a nuisance stretches Oklahoma law beyond recognition.   [*Motion*, 29-30 ("The continuing nuisance—the operation of the Lorraine Refinery—had already been abated by the time of Wilcox's involvement because the Lorraine Refinery had been taken down to the ground when Wilcox acquired the property.")].

The Court need only look to the cases cited by Kinder Morgan to see the conflict between Kinder Morgan's position and Oklahoma law.  *Tosco*, 216 F.3d 886; *Burlington Northern and Santa Fe Railroad Co. v. Grant*, 505 F.3d 1013 (10th Cir. 2007).  In *Tosco*, the plaintiff brought an action in 1997 seeking contribution for cleaning up pollution from a defendant that ceased operations in 1949.   216 F.3d at 890, 891.  The pollution included petroleum seeps into a nearby creek and the presence of petroleum hydrocarbons in the groundwater under the former refinery. *Id.* at 895.  Further, the Tenth Circuit characterized the nuisance as the existing pollution (not the pre-1949 polluting activities):

> [T]here is ample record evidence establishing Koch disposed of hazardous wastes that have percolated through the soils and into the groundwater beneath the Refinery.  The groundwater is hydrologically connected to the Creek as evidenced by the seeps.  Consequently, Koch's denial of any unlawful activity vis a vis water pollution *and the public nuisance stemming therefrom rings hollow*.

*Id.* (emphasis added).

The Tenth Circuit determined that the hazardous waste seeping into the creek constituted a public nuisance, not just the initial release of hazardous waste into the environment by the refinery. *See id.*  Likewise, here, the summary judgment evidence is undisputed that there are petroleum

hydrocarbons in the groundwater and ongoing seeps into nearby creeks, including creeks adjoining and running through the Wilcox Site and Plaintiffs' property, which create a public nuisance.

Likewise, the Tenth Circuit considered the pollution, and not the activity leading to pollution, a nuisance in *Burlington*. *See* 505 F.3d 1013. In *Burlington*, the plaintiff sought damages for remediation conducted in 2001. *Id.* at 1018. The remediation cleaned up "tar-like material" that had moved progressively downhill from an old refinery because of earth work conducted in the early 1970s. *Id.* The plaintiff asserted that the tar-like material created a public nuisance, and the Tenth Circuit agreed that the plaintiff could succeed under a public nuisance theory if it proved the facts pleaded. *See id.* at 1017-18; *see also Blocker*, 380 F.Supp.3d at 1183 (denying summary judgment on public nuisance claim where 2010 complaint alleged that defendant predecessor-in-interest polluted groundwater through pre-1991 oil and gas production); *Moore v. Texaco, Inc.*, 244 F.3d 1229, 1231 (10th Cir. 2001) ("We have recognized that under Oklahoma law, a successor landowner may be entitled to pursue a claim for public nuisance against a predecessor responsible for groundwater pollution.").

Because pollution is a nuisance, the failure to abate the pollution results in liability. *See Meinders v. Johnson*, 134 P.3d 858, 867 (Okla. 2005) ("a successor operator may be held liable for maintaining a pollution-related nuisance created by a predecessor"); Okla. Stat. tit. 50, § 5 ("every successive owner of property who neglects to abate a continuing nuisance upon, or in the use of such property, created by a former owner, is liable therefor in the same manner as the one who first created it.").

Pollution that affects a public right is a nuisance. *Tosco*, 216 F.3d 886. And, property owners who fail to abate a nuisance are liable "in the same manner as the one who first created it." Okla. Stat. tit. 50, § 5.

### ii.       Kinder Morgan is liable for negligence.

Kinder Morgan argues that it cannot be liable for negligence related to contamination of the Church property. [*Motion*, 30-31]. Not so. There is no dispute in this case that Wilcox operated the refinery to the immediate east of the Church property (the "Wilcox Process Area"), and that the refinery resulted in significant contamination to the soil and groundwater. [*See id.*, Exhibit 12 at 12-13]. And, Plaintiffs have presented evidence that contamination from the Wilcox process area has and is migrating to the Church property (thereby causing pollution on the Church property). [Exhibit 6]. Therefore, even if Kinder Morgan's negligence arguments were correct (which Plaintiffs' dispute), Kinder Morgan cannot succeed on summary judgment as to negligence. *See Ohio Oil Co. v. Elliott*, 254 F.2d 832, 834 (10th Cir. 1958) (applying negligence to salt water contamination); *Blocker*, 380 F.Supp.3d at 1188 (negligence available for claim regarding pollution).

### iii.      Plaintiffs have a claim under a strict liability theory.

Kinder Morgan argues that Plaintiffs' claim for strict liability fails as a matter of law because "Plaintiffs cannot establish that Wilcox undertook any conduct . . . ." [*Motion*, 31]. But, Plaintiffs have established that Wilcox operated the refinery on the Wilcox Process Area, that pollution and contamination emanated from the refinery activities, and that contamination from the Wilcox Process Area has migrated to the Church property. [*Id.* Exhibit 12 at 5; Exhibit 6]. Therefore, Kinder Morgan's argument that its predecessor did not undertake any conduct that would impact Plaintiffs fails.

### iv.      Plaintiffs have a claim for unjust enrichment.

Owners of property are required to abate nuisances on their property, even if they did not create the nuisance. *Meinders*, 134 P.3d at 867. Failure to clean up pollution, or abate a nuisance, can give rise to a claim for unjust enrichment under Oklahoma law. *N.C. Corff*, 929 P.2d at 295;

*Burlington Northern*, 505 F.3d at 1030.  The Western District summarized Oklahoma law on the

issue in *Branch v. Mobil Oil Corp.*, 778 F.Supp. 35 (W.D. Okla. 1991):

> Unjust enrichment can occur when a defendant uses something belonging to the Plaintiff in such a way as to effectuate some kind of savings which results in or amounts to a business profit.  Oklahoma recognizes a claim for negative unjust enrichment.  The Court cannot say that Plaintiffs' Complaint does not state a claim for unjust enrichment on which relief can be granted based on a failure to allege a benefit conferred on Defendants.  ***It can be inferred from Plaintiffs' Amended Complaint that Defendants used Plaintiffs' property to dispose of pollutants and saved the expenses of otherwise collecting and disposing of same***.

(emphasis added and internal citations omitted).

Kinder Morgan's reliance on *Moore* is misplaced.  244 F.3d 1229.  In *Moore*, the plaintiff

"failed to show that [the defendant] caused any pollution or that it had any responsibility for

cleaning up the pollution on the property."  Here, Kinder Morgan's responsibility is twofold.  First,

Wilcox had responsibility to abate the nuisance on the Lorraine process area as a successor owner.

*Meinders*, 134 P.3d at 867.  Second, Wilcox had responsibility to prevent the escape and migration

of pollutants from the Wilcox Process Area to the Church property.  *See* Okla. Stat. tit. 50, § 1.

Because Wilcox caused the pollution and had a responsibility to clean up the Lorraine process

area, *Moore* is distinguishable.

> **D.**     **"Dismissal" of Plaintiffs' Claims for Personal Injury, Real Property Damage, and Punitive Damages Is Improper.**

Kinder Morgan argues that Plaintiffs' claims for personal injury, real property damage, and

punitive damages must be "dismissed" for lack of evidence.  [*Motion*, 33].  However, Plaintiffs

have submitted evidence for each element of damage.

Plaintiffs have moved to admit summary judgment evidence regarding their personal

injuries through the testimony of Mark Evans and Christina Evans, and through the declaration

and expert report Dr. Robert Harrison.  [Exhibit 16; Exhibit 2; Exhibit 3; Exhibit 41].  For all of

the reasons discussed in *Plaintiffs' Response to BP, p.l.c.'s Motion for Summary Judgment* (which

are incorporated herein in full), the testimony of Mark Evans, Christina Evans, and Dr. Harrison is sufficient to support the personal injury claims.

Likewise, Plaintiffs have moved to admit summary judgment evidence regarding the real property damage at issue in this case. [*See* Exhibit 9; Exhibit 10].  For all of the reasons discussed in *Plaintiffs' Response to Marathon Defendants' Motion for Summary Judgment* (which are incorporated herein in full), the testimony of Rick Carlile (Plaintiffs' real estate appraiser) is sufficient to support the real property claims.

Kinder Morgan also argues that "Plaintiffs have put no evidence into the record to make a showing" that Kinder Morgan is liable for punitive damages. [*Motion*, 34].  Kinder Morgan's own summary judgment evidence demonstrates that Kinder Morgan is liable for punitive damages to the same extent as its predecessor entity, El Paso Corporation.  In 2012, Kinder Morgan merged with the El Paso Corporation, and Kinder Morgan is the surviving entity. [*Motion*, 22, Exhibit 17 at 2].  Under Delaware law (which Kinder Morgan asserts applies to the corporate law issues in this case), the corporation surviving a merger possesses all rights and liabilities of the corporation that did not survive the merger. *See, e.g.*, *Gould v. American Hawaiian S.S. Co.*, 331 F.Supp. 981, 998 (D. Del. 1971).

## V.   CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that this Court deny summary judgment and schedule this matter for trial at the first available setting.

Respectfully submitted,

/s/ Michael K. Reer

James Key, *Admitted Pro Hac Vice*
TX 24012958
Michael K. Reer, *Admitted Pro Hac Vice*
OBA #34074
HARRIS, FINLEY & BOGLE, P.C.
777 Main Street, Suite 1800
Fort Worth, Texas 76102
Phone: (817) 870-8700
Fax:    (817) 332-6121
Jkey@hfblaw.com
Mreer@hfblaw.com

Allan DeVore, OBA# 2328
Jandra Susanne Cox, OBA #16610
DeVore Law Firm, PLC
5709 NW 132nd Street
Oklahoma City, OK 73142
Phone: (405) 603-8585
Fax:    (877) 636-8113
allan@devorelawok.com
jandra@devorelawok.com

Michael J Blaschke, OBA# 868
Michael J Blaschke PC
3037 NW 63rd Street, Suite 251
Oklahoma City, OK 73116
Phone: (405) 562-7771
Fax:    (405) 285-9350
mblaschke@thelawgroupokc.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify that on December 3, 2020, a copy of *Plaintiffs' Response to Defendant Kinder Morgan, Inc.'s Motion for Summary Judgment and Brief in Support Thereof* was served by e-mail, as well as through the CM/ECF system, which automatically serves a Notice of Electronic Filing to each of the parties through their counsel as set forth below.

 */s/ Michael K. Reer*
Michael K. Reer

Stacy L Acord
sacord@ok-counsel.com
Melissa Ann East
meast@ok-counsel.com
Archer Scott McDaniel
smcdaniel@ok-counsel.com
MCDANIEL ACORD & LYTLE, PLLC
9343 E 95th Court
Tulsa, OK 74133
918-382-9200
918-382-9282 (fax)
*Counsel for Defendant, BP p.l.c.*

Bonnie A Barnett
bonnie.barnett@dbr.com
Patricia Leigh Bausinger
leigh.bausinger@dbr.com
DRINKER BIDDLE & REATH LLP
(Pennsylvania)
1 Logan Square, Suite 2000
Philadelphia, PA 19103
215-988-2916
215-988-2757 (fax)
*Counsel for Defendant, Kinder Morgan, Inc.*

Kenneth H Blakley
kblakley@elbattorneys.com
Travis Walter Brown
tbrown@elbattorneys.com
Robert Dale Edinger
redinger@elbattorneys.com
Jacqueline Gayle Stone
jstone@elbattorneys.com
EDINGER LEONARD & BLAKLEY PLLC
6301 N. Western Avenue, Suite 250
Oklahoma City, OK 73118
405-848-8300
405-605-8381 (fax)
*Counsel for Defendant, Marathon Oil Corporation and Defendant, Marathon Petroleum Corporation*

Larry D. Ottaway
larryottaway@oklahomacounsel.com
Amy Sherry-Fischer
amyfischer@oklahomacounsel.com
Andrew M Bowman
andrewbowman@oklahomacounsel.com

FOLIART HUFF OTTAWAY & BOTTOM
201 Robert S. Kerr Avenue, 12th Floor
Oklahoma City, OK 73102
405-272-4633
405-232-3462 (fax)
*Counsel for Defendant, Kinder Morgan, Inc.*

Ross Allen Lewin
ross.lewin@dbr.com
DRINKER BIDDLE & REATH LLP (New Jersey)
105 College Road E, Suite 300
Princeton, NJ 08542
609-716-6500
609-799-7000 (fax)
*Counsel for Defendant, Kinder Morgan, Inc.*