## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **BRISTOW FIRST ASSEMBLY OF** | ) | |
| **GOD**, *et. al.,* | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **Case No. 4:15-cv-00523-TCK-CDL** |
| **BP p.l.c.,** *et. al.,*; | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

### PLAINTIFFS' RESPONSE TO DEFENDANT BP P.L.C.'S MOTION FOR SUMMARY JUDGMENT, AND BRIEF IN SUPPORT

Plaintiffs Bristow First Assembly of God, Mark S. Evans, and Christina J. Evans, individually and as parents and next of kin to C.J.E. and B.K.E., minor children (collectively, "Plaintiffs") file this *Response to Defendant BP p.l.c.'s Motion for Summary Judgment, and Brief in Support* [Dkt. 288] and respectfully show the Court as follows:

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................... 2

TABLE OF AUTHORITIES ..................................................................................... 3

I.      PLAINTIFFS' RESPONSE TO BP P.L.C.'S STATEMENT OF UNDISPUTED FACTS. 5

II.     PLAINTIFFS' STATEMENT OF FACTS .......................................................... 6

        A.      Wilcox Site Refinery Operations Resulted in Massive, Latent Contamination...... 6

        B.      The Church and Evans Family Learn of Contamination in July 2013 .................. 8

        C.      BP Has Succeeded to Wilcox Liabilities................................................ 12

III.    LEGAL STANDARD AND SUMMARY JUDGMENT EVIDENCE ........................... 17

IV.     LEGAL ARGUMENT ................................................................................ 19

        A.      Plaintiffs Have Introduced Evidence of BP Liability ............................... 19

                i.      Plaintiffs have established operation and causation.................................. 19

                ii.     A fact question exists as to Plaintiffs' alter-ego theory........................... 22

        B.      Plaintiffs' Claims Are Not Barred By Limitations.................................. 26

        C.      Plaintiffs Have Introduced Evidence of Personal Injury ...................... 27

        D.      Plaintiffs Have Carried Their Burden on Real Property Damages ...................... 27

V.      CONCLUSION........................................................................................ 27

CERTIFICATE OF SERVICE ............................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Adamson v. Multi Cmty. Diversified Servs., Inc.*,
 514 F.3d 1136 (10th Cir. 2008) .........................................................................................17

*Canal Ins. Co. v. Montello, Inc.*,
 822 F.Supp.2d 1177 (N.D. Okla. 2011) .............................................................................22

*Chevron Mining, Inc. v. U.S.*,
 863 F.3d 1261 (10th Cir. 2017) .........................................................................................21

*Frazier v. Bryan Memorial Hosp. Authority*,
 775 P.2d 281 (Okla. 1989) ..................................................................................22, 23, 26

*Gilbert v. Security Finance Corp. of Oklahoma, Inc.*,
 152 P.3d 165 (Okla. 2006) ............................................................................................23, 26

*Gilliam v. Lake Country Raceway*,
 24 P.3d 858 (Okla. 2001) ...................................................................................................20

*Lewis v. Central Okla. Med. Group., Inc.*,
 998 P.2d 202 (Okla. Civ. App. Nov. 5, 1999) ...................................................................26

*Mattingly Law Firm, P.C. v. Henson*,
 466 P.3d 590 (Okla. Civ. App. 2019) ................................................................................23

*Morton v. Watco Co., Inc.*,
 No. CIV-06-88-F, 2006 WL 1620326 (W.D. Okla. June 6, 2006) ....................................26

*Okla. Cardiovascular Assoc., PC v. Techtronic Indus. North America, Inc.*,
 No. CIV-08-579-R, 2009 WL 10672422 (W.D. Okla. Mar. 19, 2009) ..............................25

*Oliver v. Farmers Ins. Group of Companies*,
 941 P.2d 985 (Okla. 1997) ..................................................................................22, 23, 25

*Roberson v. PaineWebber, Inc.*,
 998 P.2d 193 (Okla. Civ. App. 1999) ................................................................................22

*Tosco Corp. v. Koch Indust., Inc.*,
 216 F.3d 886 (10th Cir. 2000) ...........................................................................................21

*Winn & Assoc., PLLC v. EmCare Physician Providers, Inc.*,
 No. 13-CV-427-JHP, 2014 WL 3573416 (E.D. Okla. July 21, 2014) ..........................22, 23

*Winn & Assoc., PLLC v. EmCare Physician Prov., Inc.*,
 No. 13-CV-00427-JHP, 2014 WL 3573443 (E.D. Okla. July 21, 2014) ............................26

## STATUTES, RULES & REGULATIONS

78 FR 75475 ..................................................................................................6, 7, 8

Fed. R. Civ. P. 56(c) ............................................................................................17

Fed. R. Evid. 106 ................................................................................................13

Local Rule 56.1(c) ................................................................................................5

## OTHER AUTHORITIES

*Superfund*, USEPA, https://www.epa.gov/superfund (last visited Nov. 12, 2020) .....................7, 8

BP p.l.c.'s *Motion for Summary Judgment and Brief in Support* (the "<u>Motion</u>") principally attacks Plaintiffs' case on two fronts.  First, BP asserts that no BP predecessor-in-interest conducted operations on the Church property.  BP's assertion is not dispositive of Plaintiffs' claims because Plaintiffs have introduced evidence that BP's operations caused contamination on the Wilcox Site, and that the contamination has migrated to the Church property.  Second, BP asserts that Plaintiffs cannot hold BP liable for obligations owed by BP affiliates and subsidiaries.  However, Plaintiffs have ample evidence that the BP family of companies are alter-egos under Oklahoma law.  Accordingly, BP's *Motion* should be denied.

## I.    PLAINTIFFS' RESPONSE TO BP P.L.C.'S STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Rule 56.1(c), Plaintiffs assert that the following "undisputed facts" in the *Motion* are controverted:

<u>Paragraph 11</u>:  Plaintiffs dispute BP's contention that "Plaintiffs have offered no evidence to substantiate any material aspect of their allegation that BP is the surviving and controlling entity, through acquisition or merger, of predecessor entities . . . ." that conducted operations on the Wilcox Site.  Plaintiffs have introduced summary judgment evidence that raises a fact question concerning alter-ego liability for all of the reasons stated in Section IV.A(ii) below.  [*See* <u>Exhibit 31</u>].

<u>Paragraph 13</u>:  Plaintiffs dispute BP's contention that "Dr. Fisher also confirmed that he will offer no opinions at trial that BP p.l.c. or any other entity acted recklessly with regard to any operations, person or the Wilcox Oil Site."  While Dr. Fisher (Plaintiffs' environmental expert) is not qualified to opine on which corporate entity (after 70-plus years of acquisitions, mergers, and name changes) bears financial responsibility for the Wilcox Site, Dr. Fisher did not confirm that he will not be testifying that the manner in which operations were conducted on the Wilcox Site

was not reckless.   [*Motion*, Exhibit D at 232:24-233:14].   In fact, his report demonstrates the complete opposite.   [Exhibit 7 at 18].

Paragraph 20:   Plaintiffs do not dispute that Dr. Vlassopoulos offered the opinions recited in paragraph 20 of the *Motion*, but do dispute the accuracy of the opinions for all of the reasons stated in Section IV.A(i) below.

## II.   PLAINTIFFS' STATEMENT OF FACTS

1.     This case concerns massive, latent contamination on a Superfund site in Bristow, Oklahoma, and the effect of such contamination on the Bristow First Assembly of God Church and the Evans Family.   In short, the soil and groundwater at the Wilcox Site became contaminated and polluted by refining companies that historically owned and operated the site.   Not knowing about the contamination, the Bristow First Assembly of God (the "Church") built a church and parsonage (in which the Evans Family lived) on the Wilcox Site.   The U.S. Environmental Protection Agency ("USEPA") added the Wilcox Site to the National Priorities List on December 12, 2013 and suit was brought in this matter on June 24, 2015.   *See* 78 FR 75475; Dkt. 2-2.

### A.     Wilcox Site Refinery Operations Resulted in Massive, Latent Contamination.

2.     The Wilcox Site concerns land that previously contained two refineries and two tank farms just outside the city limits of Bristow, Oklahoma.   [Exhibit 15 at 3-4].   The Wilcox Site consists of the former Lorraine Refinery (constructed on land now owned by the Church), the Wilcox Refinery (initially constructed on land immediately to the east of the Church and referred to herein as the "Wilcox Process Area"), the North Tank Farm (immediately to the north of Church), and the East Tank Farm (immediately to the east of the Wilcox Refinery).

3.     Refining operations on the Wilcox Site began in the 1920s and continued through 1963.   [*Id.* at 3].   Refining activities on the Wilcox Site had an estimated capacity of 4,000 barrels of oil per day, which resulted in an estimated waste stream of approximately 40 barrels per day.

[*Id.* at 5, 6].  To feed the refineries, unprocessed crude oil was brought in directly from the field, which resulted in crude with high bottom sediment and water.  [*Id.* at 5].

4.      The refineries were poorly constructed and environmentally unfriendly, even by pre-1960s standards.  For example, according to the Oklahoma Department of Environmental Quality ("ODEQ"), the crude oil storage tanks lacked any metal or wooden bottoms, allowing crude oil to seep directly into the dirt and groundwater.  [Exhibit 21 at 25:8-18].  Further, the refineries used open pits and gravity to separate wastewater from oil, and no liner was used to prevent wastewater and oil from seeping directly into the soil and groundwater.  [*Id.* at 25:19-26:9].  Likewise, no liners were used to prevent direct discharge into the soil and groundwater at the skimming pond.  [*Id.* at 26:25-27:13].  When the refinery operations were concluded, the soil and groundwater impacts from the refining operations were left in place, without any warning to future owners.  [Exhibit 5 at 2].  As time passed, the left in place contamination soaked beneath the surface such that the contamination became latent, and not obvious to unsuspecting future landowners.  [*Id.* at 6].

5.      As a direct result of the refining and oil storage activities on the Wilcox Site, the soil and groundwater underlying the Church property is now highly contaminated with heavy metals and hydrocarbons.  [*Id.* at 5].  That the Wilcox Site is heavily contaminated is beyond legitimate dispute.  USEPA has enrolled the Wilcox Site in the Superfund Program, which is "responsible for cleaning up some of the nation's most contaminated land and responding to environmental emergencies . . . ." *Superfund*, USEPA, https://www.epa.gov/superfund (last visited Nov. 12, 2020); 78 FR 75475.  Further, the Wilcox Site has been added to the National Priorities List, which consists of sites "where releases of contamination pose human health and

environmental risks." *Superfund*, USEPA, https://www.epa.gov/superfund (last visited Nov. 12, 2020); 78 FR 75475.

6. The Wilcox Site (which USEPA added to the National Priorities List as a single, contaminated site for cleanup purposes) contains several individual, privately-owned parcels, each of which is contaminated, and contamination and pollutants migrate from adjoining parcels to the Church property. [Exhibit 6; Exhibit 7 at 14]. Among other reasons, groundwater and contaminates migrate over and across the Church property to reach the Sand Creek. [Exhibit 6; Exhibit 7 at 14; Exhibit 15 at 14]. The Sand Creek is a jurisdictional, navigable waterway. [Exhibit 25 at 7].

**B.      The Church and Evans Family Learn of Contamination in July 2013.**

7. The contamination on the Wilcox Site, which consists of (among other things) heavy metals, lead, arsenic, hydrocarbons, and other substances within the soil, is generally latent and not readily discoverable to those who are not environmental professionals. [*See* Exhibit 5 at 6]. Defendants have deposed five members of the Church (including four pastors) in an effort to prove that the Church knew or should have known about the latent contamination alleged before June of 2013. But, all five deponents were uniform in their insistence that while concrete foundations and scattered pipe evidenced past industrial activity on the Church property, they did not know and had no reason to know of the massive, latent contamination in the soil and groundwater under the Church property.

8. Terry Dorsey (pastor from 1984 through 1987) testified during his deposition that he was aware of concrete formations and exposed piping from former refinery operations, but that he had "no working knowledge" that the property had been impacted by historical refinery operations. [Exhibit 19 at 60:1-10; 62:5-12]. Mr. Dorsey repeatedly testified that he did not see any active seepage while on the property and that he did not see any evidence of dumping on the

property.  [*Id.* at 71:21-23; 79:6-14].   Mr. Dorsey also testified that while the runoff from the property appeared to have a sheen, the sheen was no different from low-lying lands elsewhere in Oklahoma—and no different from the sheen commonly seen on runoff from asphalt roads.  [*Id.* at 84:7-15; 93:9-94:25].  In short, "there was no knowledge . . . of any of the ailments of the property" and "no knowledge at that point of danger . . . ."  [*Id.* at 112:17-25; 119:8-24].

9.      Johnny Dale Floyd (pastor from 1991 through 1995) testified that during the time in which he was pastor, he inquired about apparent oil seeps on the property, and requested a site visit by ODEQ.  [Exhibit 17 at 10:1-4].  ODEQ made a site visit, Mr. Floyd showed ODEQ where on the site he had found oil seeps, and ODEQ told Mr. Floyd that ODEQ did not "see anything that you need to be concerned about."  [*Id.* at 10:1-24; 13:23-25; 46:9-47:4; *see also* 50:16-51:21].  Mr. Floyd recounted his conversation with ODEQ as follows:

> After—after we walked around, it was kind of cool that day, and we went into the house.  And that's where my wife was, and we visited for a while.  And I asked him the question, should we be worried?  What do I do?  He said, at this time, I would do nothing.  And he said, I don't think there's anything to be worried about.  I don't—he said, I don't see anything that you need to be concerned about.

[*Id.* at 46:16-23].  Trusting the assessment of ODEQ, Mr. Floyd did not further investigate the matter.  Members of the Church attributed the oil seeps to natural causes.  [Exhibit 16 at 166:11-14 ("They just thought maybe there was . . . oil coming up out of the ground like anywhere else in Oklahoma.")].

10.     Doug Sampley (pastor from 1995 through 2007) testified that he had no knowledge of investigations, sampling, or work performed by ODEQ or USEPA on the property.  [Exhibit 20 at 67:22-68:2; 79:7-88:16].  Mr. Sampley testified that he did not recall any stained soil, runoff with a sheen, or any foreign material seeping into the Sand Creek (which lies to the extreme west of the Wilcox Site and Church property).  [*Id.* at 71:4-15; 91:12-16].  In fact, Mr. Sampley testified

that he did not recall seeing any "spot that looks contaminated to me." [*Id.* at 71:4-5].  Mr. Sampley did recall seeing areas where the grass did not grow on the Church property, but believed that concrete foundations or rock at or near the surface were the cause.  [*Id.* at 70:22-25; 92:16-21; 100:19-22].

11.     Dale Allen is a plumber who has attended the Church since June 1986.  [*Motion*, ¶ 47].  During his deposition, Mr. Allen flatly and consistently denied that he knew that there were any abnormal issues with the Church property.  Mr. Allen drew a sharp distinction between visible concrete and leftover pipe and knowledge of a significant environmental harm:

> It's Oklahoma.  And as a plumber, you run into all kinds of things.  Whenever people build sites and stuff like that, you run into all kinds of things.  And as far as I know, these things had nothing to do with any – towards contamination of the property or what it was.  I had no idea what they were.

[Exhibit 18 at 133:24-135:3].  In fact, in Mr. Allen's view, the Wilcox Site appeared to be "a normal site in Oklahoma you find."  [*Id.* at 138:17-21].  Mr. Allen also disclaimed knowledge that the visible concrete and pipe were from refinery operations.  [*Id.* at 77:4-79:1 ("I didn't know what they were from."); 136:3-14 ("I don't know what was built on the property."); 181:21-182:9 ("We didn't even know that that was on—had been on the property until Brother Evans brought all of that out.")]  Mr. Allen also testified that the Church did not "come across any oily soil or debris" during the construction projects in which he took part, that he was unaware of the numerous former tar pits on the Church property, that the only oil sheens he saw on the property were similar to those common in runoff from asphalt streets, and that the stains he saw on the ground of the Church property were similar to those he sometimes sees deer hunting in the wilderness.  [*Id.* at 57:1-4 (no oily soil); 80:4-6 (no knowledge of former tar pits); 194:14-20 (oil sheens appear as if from asphalt); 133:24-135:3 (stains similar to those seen deer hunting)].

12.     Mark Evans (pastor from 2012 through present) testified during his deposition that he did not know that the Church property had formerly been used for refinery operations and that he had no inclination that there had been a prior industrial use of the property.  [Exhibit 16 at 51:5-7; 56:1-7].  Mr. Evans testified that prior to July 2013 he was not aware of any buried foundations, structures, piping, or waste on the property.  [*See id.* at 81:2-12].  Mr. Evans testified that he was not aware of any areas on the Church property where grass would not grow, but noticed what he thought was gray rock outcropping in the backyard.  [*Id.* at 56:8-19; 59:14-60:5].

13.     In the spring of 2013, Mr. Evans' son and a friend were playing in the Sand Creek and came back to the parsonage with a black material covering their shoes.  [*Id.* at 57:12-58:24].  Mr. Evans followed his son to the creek and noticed that translucent oily or soapy materials were on the top of the water.  [*Id.*].  Mr. Evans told his son not to play in the creek anymore because there might be a problem with the creek.  [*Id.*].  Mr. Evans did not identify the cause of the soapy substance and thought that someone may have been dumping in the creek.  [*Id.* at 88:24-89:8].

14.     In approximately May of 2013, the Evans children were playing with a hose outside and smeared a sticky substance on their faces that was difficult to remove.  [*Id.* at 94:14-97:1].  The sticky substance was distinctly different from the translucent substance found by the creek.  [*Id.* at 96:16-97:3].  At the time, Mr. Evans thought that a tractor might be leaking oil into the backyard.  [*Id.* at 89:22-90:2].

15.     Around the same time period, Mr. Evans saw a television commercial from the Oklahoma Energy Resources Board ("OERB"), which caused him to call and inquire whether OERB could visit the property.  [*Id.* at 66:14-67:9].  OERB referred Mr. Evans to the Oklahoma Corporation Commission, which visited the property, noted that additional investigation was necessary, and referred Mr. Evans to ODEQ.  [*Id.* at 73:18-74:14; 78:4-8].  A meeting at the Church

property with ODEQ, USEPA, and Mr. Evans occurred on July 2, 2013, at which point representatives from ODEQ and USEPA disclosed, in general, that serious contamination existed on the Church property and that Mr. Evans should "get [his] family off this property." [*Id.* at 119:15-122:12]. Mrs. Evans and the children moved from the parsonage that night and Mr. Evans followed the next day. [*Id.*].

16.     This lawsuit was filed on June 24, 2015. [*Motion*, ⁋ 24].

**C.     BP Has Succeeded to Wilcox Liabilities.**

17.     Several BP affiliates are successors-in-interest to entities that operated the Wilcox Site. [*See* Exhibit 26 at 13-16, 21-28]. BP contends that BP Corporation North America, Inc. is the successor to the Standard Oil Company of Indiana. [*Motion*, ⁋ 9]. The Standard Oil Company operated oil storage facilities on parcels comprising the Wilcox Process Area and the East Tank Farm. [*Id.* at 9, 21; Exhibit 36]. The oil storage facilities were used for feedstock and/or oil products produced by the Lorraine Refinery on the Church property. [*Compare* Exhibit 36 (1915 tank site lease) *with* Exhibit 22 at 27 (Continental Refining Company operator of Lorraine Refinery from 1915 through 1917); Exhibit 15 at 000009, 000052 (Wilcox Refinery built in 1920s)].

18.     The Sinclair Pipe Line Company operated a portion of the East Tank Farm. [Exhibit 26 at 25]. Sinclair Pipe Line Company operations on the East Tank Farm "included the laying and maintaining of pipeline for the transportation of oil and gas." [*Id.*]. BP Pipelines (North America), Inc. is the successor-in-interest, by name change and merger, to the Sinclair Pipe Line Company. [*Id.* at 25-28; Exhibit 37].

19.     The Sinclair Refining Company operated a portion of the East Tank Farm through a right of way easement that allowed for the laying, maintaining, operating, repairing, replacing, and removing of pipeline for the purpose of transporting crude petroleum, feedstock, crude, oil,

and gas.  [Exhibit 26 at 13].  Atlantic Richfield Company (a BP subsidiary) is the successor-in-interest, by name change and merger, to the Sinclair Refining Company.  [*Id.* at 13-16; Exhibit 38].

20.     In July 2014, USEPA sent special notice letters to the Atlantic Richfield Company and BP Corporation notifying both that "EPA has determined that you are potentially liable under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA or Superfund) . . . and are responsible for the cleanup of this Site, including all past costs incurred by the EPA in responding to releases at the Site."  [Exhibit 34; Exhibit 35].  Upon receiving the letter, Douglas Reinhart (a lawyer at BP Legal) assumed that the letter addressed to "BP Corporation" was intended for BP Products North America, Inc.—which he asserts is a successor-in-interest to Standard Oil.  [Exhibit 31 at 46:15-47:1; 87:6-88:8; 92:8-19].

21.     In March 2015, the USEPA contractor assigned to find potential responsible parties for the Wilcox Site cleanup identified Atlantic Richfield Company, BP Corporation North America, Inc., and BP Pipelines (North America) Inc. as "presumed viable successors to entities identified as potentially responsible parties (PRPs) to the site . . . ."  [Exhibit 26 at 1, 13-16, 21-28].  The March 2015 Report is included, in part, within BP's summary judgment evidence, and (to the extent necessary) Plaintiffs' move to admit the report (which is attached hereto as Exhibit 26) in full under the rule of optional completeness.  *See* Fed. R. Evid. 106.

22.     The deposition testimony of Mr. Reinhart is evidence of pervasive disregard for the corporate form within the BP family of companies.  Mr. Reinhart testified that the BP family of companies operates on the basis of cross-corporation functional groups, instead of on the basis of the corporate form:

A function—within BP, a function is a group of employees or a business that performs specific tasks that don't necessarily—they don't match up precisely with this corporate entity structure.  So, for example, BP Legal isn't anywhere on this Exhibit 61 because BP Legal is not a corporate entity.  It's not a corporation or a LLC or anything of that sort.  BP Legal is a group within—is a group within the BP business that supports the different businesses, the different operations that BP has.  So, for example, BP Products North America, Inc. is the corporate entity that may own a refinery or may own a service station or something of that sort.  There's a business that's called Fuels North America that actually does the operations of that business of the refinery or the fuel sales or things like that.  So that business BP Legal as a function would support that business, that fuels business.  ***So that's really kind of how we look at it more as businesses as opposed to corporate entities***.

[Exhibit 31 at 71:17-72:15 (emphasis added)].

23.     Mr. Reinhart repeatedly emphasized in his deposition that the BP affiliates pursue business objectives for BP on the basis of business function, and not on the basis of the corporate form, and that achieving the overall business objective for BP is more important than the individual business interests of the purportedly separate corporate entities:

A. So you are talking about different corporate entities, and again we kind of get into this distinction between the corporate legal entities, the corporations, and that sort of thing versus the functions or the businesses. So I don't -- I couldn't say that there were conflicts among entities with different goals. There are times when businesses or functions may have conflicting goals or, you know, may need to work out issues where they have diverging goals.

Q. And how does that -- how, if at all, does that impact the One Team approach?

A. The way to solve and address those issues is by working collaboratively, having discussions approaching this that we are searching for the best overall outcome possible.

Q. Do you think that -- do you believe that the corporate entities -- like the entity itself is significant?

MR. McDANIEL: Object to the form.

BY THE WITNESS:

A. ***The entity itself is significant, no. The business is more significant than the entity itself, than the legal corporate entity***.

[*Id.* at 187:6-188:7]. That the various corporate structures of the BP affiliates are unimportant is also reflected by the fact that Mr. Reinhart's letterhead (including the letterhead used to communicate with USEPA on behalf of Atlantic Richfield Company and BP Products North America Inc.) identifies Mr. Reinhart as being with BP America Inc. (even though Mr. Reinhart is ostensibly not employed by BP America Inc. and was not representing BP America Inc. in his communications to USEPA). [*Id.* at 78:13-25].

24.     Mr. Reinhart went so far in his deposition to testify that, as a lawyer within BP Legal, ***his clients are the unincorporated, legally unrecognizable business functions and not any corporate affiliate or entity within BP***:

> Q. Okay. So your client is not an entity, correct?
>
> A. Correct. I don't provide the support directly to a corporate entity like BP America Inc. or BP Corporation (North America) Inc. in this context. It's not -- it's not the way we talk about how we do our work.

[*Id.* at 175:4-14].

25.     The evidence from Mr. Reinhart establishes that the cross-corporate functional business groups exist to provide support and make money for BP p.l.c. (which sits at the top of the corporate structure). For example. Mr. Reinhart did not know whether BP Corporation (North America) Inc. "is in the business of making money" but had no doubt that BP p.l.c. was in the business of making money. [*Id.* at 43:5-21]. And, even though Mr. Reinhart is nominally employed by BP Corporation (North America) Inc., and even though his job duties and responsibilities only include representing "BP America and its subsidiaries"—he is also expected at times to respond to lawsuits filed against BP p.l.c. despite the fact that he is not aware of any agreement in place between BP p.l.c. and BP Corporation (North America) Inc. to share personnel. [*Id.* at 23:4-8, 27:24-29:12, 182:12-16]. Further, Mr. Reinhart is not aware of any compensation

paid to BP Legal or BP Corporation (North America) Inc. for the legal work he performs for BP p.l.c. or other BP subsidiaries. [*Id.* at 41:15-24].

26.     However, there is no question that BP exerts control over both the cross-functional groups and the properly formed corporations and business entities. For example, BP International Ltd. issues the remediation management guidelines by which BP personnel "all over the world" are expected to abide. [*Id.* at 176:7-21, 196:9:24; Exhibit 40]. Likewise, the cross-functional groups (such as BP Legal) submit their yearly budget requests to the "global company." [Exhibit 31 at 43:25-44:5].

27.     Moreover, BP p.l.c.'s *Preliminary Witness List* further demonstrates that BP conducts its business on the basis of cross-corporate functional groups without regard to the corporate form. [Exhibit 32]. BP p.l.c.'s *Preliminary Witness List* identifies Mr. Reinhart as "Senior Counsel with BP plc" despite the fact that Mr. Reinhart testified he is employed by BP Corporation (North America) Inc., understands his job functions and responsibilities as representing and defending BP America, Inc. (and its affiliates and subsidiaries—not BP p.l.c.), and is unaware of any agreements between BP p.l.c. and BP Corporation (North America) Inc. to share personnel or to otherwise compensate BP Corporation (North America) Inc. for the time spent working on BP p.l.c. matters. [*Compare id. with* Exhibit 31 at 23:4-8, 27:24-29:12, 41:15-24, 182:12-16]. Likewise, the *Preliminary Witness List* lists Mr. Reinhart's communications with USEPA regarding the Wilcox Site as "BP p.l.c.'s response to the Environmental Protection Agency" even though the letter is written on BP America, Inc. letterhead, with a BP p.l.c. logo, and purportedly on behalf of Atlantic Richfield Company and BP Products North America Inc. [*Compare* Exhibit 32 *with* Exhibit 41].

III.     **LEGAL STANDARD AND SUMMARY JUDGMENT EVIDENCE**

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.*

In support of this *Response*, Plaintiffs rely on the pleadings and papers on file with the Court and respectfully request that the Court take judicial notice of the same. Additionally, Plaintiffs submit the following summary judgment evidence, which is fully incorporated herein by reference for all purposes:

Exhibit 1        Declaration of Mark Evans

Exhibit 2        Declaration of Dr. Robert Harrison

   Exhibit 3        Expert Report of Dr. Robert Harrison

Exhibit 4        Declaration of Gerald Wollaston

   Exhibit 5        Expert Report of Gerald Wollaston

Exhibit 6        Declaration of J. Berton Fisher

   Exhibit 7        Expert Report of J. Berton Fisher

   Exhibit 8        Wilcox Process Area Geologic Cross Section A-A'

Exhibit 9        Declaration of Rick Carlile

   Exhibit 10       Expert Report of Dr. Rick Carlile

Exhibit 11       Declaration of Mike Blaschke

   Exhibit 12       March 1999 Site Assessment Report for Wilcox Refinery Bristow, Creek  County, Oklahoma

   Exhibit 13       July 28, 2014 Special Notice Letter for the Wilcox Oil Superfund Site, Bristow, Creek County, Oklahoma

Exhibit 14      Site Inspection Report Lorraine Refinery

Exhibit 15      Preliminary Assessment of the Wilcox Oil Company

Exhibit 16      Deposition Transcript Excerpts of Mark Evans

Exhibit 17      Deposition Transcript Excerpts of Johnny Dale Floyd

Exhibit 18      Deposition Transcript Excerpts of Dale Allen

Exhibit 19      Deposition Transcript Excerpts of Terry Dorsey

Exhibit 20      Deposition Transcript Excerpts of Doug Sampley

Exhibit 21      Deposition Transcript Excerpts of Todd Downham

Exhibit 22      May 16, 2014 Draft Title Search and Corporate History Report for the Wilcox Oil Superfund Site

Exhibit 23      March 27, 2018 General Notice Letter for the Wilcox Oil Refinery Superfund Site Bristow, Creek County, Oklahoma

Exhibit 24      Wilcox Oil Company 2012 Aerial Photograph

Exhibit 25      Wetland Delineation Report

Exhibit 26      March 16, 2015 Wilcox Superfund Site Enhanced Corporate and Operational History Report

Exhibit 27      April 8, 2014 Wilcox Oil Superfund Site Draft Title Search Report

Exhibit 28      February 19, 1997 ODEQ Memorandum Regarding Potentially Responsible Party (PRP) Search and Current Ownership of the Property

Exhibit 29      Deposition Transcript Excerpts of Mark Ehrman

Exhibit 30      Transcontinental Tank Site Lease

Exhibit 31      Deposition Transcript Excerpts of Douglas Reinhart

Exhibit 32      Defendant BP p.l.c. Preliminary Witness List

Exhibit 33      September 19, 2014 Correspondence from BP Legal to USEPA

Exhibit 34      July 28, 2014 Correspondence from USEPA to BP Corporation

| | |
|---|---|
| <u>Exhibit 35</u> | July 28, 2014 Correspondence from USEPA to Atlantic Richfield Company |
| <u>Exhibit 36</u> | Standard Oil Tank Site Leases |
| <u>Exhibit 37</u> | Sinclair Pipe Line Company to BP Pipelines (North America), Inc. |
| <u>Exhibit 38</u> | Sinclair Refining Company to Atlantic Richfield Company |
| <u>Exhibit 39</u> | BP America Inc. Legal Structure |
| <u>Exhibit 40</u> | Remediation Management Defined Practice |
| <u>Exhibit 41</u> | Deposition Transcript Excerpts of Christina Evans |
| <u>Exhibit 42</u> | Deposition Transcript Excerpts of James Tack |
| <u>Exhibit 43</u> | Certification of Documents |
| <u>Exhibit 44</u> | Unpublished Authorities |

## IV.  LEGAL ARGUMENT

BP's core legal argument is that Plaintiffs have failed to demonstrate that BP is liable for the contamination and pollution of the Church property.  BP's argument should be rejected because Plaintiffs have submitted summary judgment evidence that BP predecessor companies participated in and conducted operations on the Wilcox Site, that the operations polluted the Church property, and that BP and its affiliates are alter-egos under Oklahoma law.  BP's legal argument also incorporates by reference arguments made by Kinder Morgan and Marathon in their respective motions for summary judgment, and these arguments should also be rejected.

### A.  Plaintiffs Have Introduced Evidence of BP Liability.

#### i.  *Plaintiffs have established operation and causation.*

BP argues that "no entity for which Plaintiffs seek to hold BP p.l.c. liable had operations on or ownership of the [Church] property."  [*Motion*, 16].  But, Plaintiffs are not required to demonstrate operations or ownership of Church property specifically if they can demonstrate that nearby operations contaminated the Church property.

Plaintiffs have demonstrated that:  BP affiliate predecessors-in-interest owned and operated a tank site lease on the Wilcox Process Area and East Tank Farm [Exhibit 36]; the tanks on the Wilcox Site were used for the storage of crude oil, feedstock, or refined product [Exhibit 21 at 24:3-25:18]; the tanks did not have bottoms, which allowed direct contact between hydrocarbons and the ground (and loss of containment) [*Id.*]; the Church soil and groundwater is highly contaminated with heavy metals and hydrocarbons [Exhibit 7 at 8-9];  the groundwater contamination migrates between and among parcels on the Wilcox Site [Exhibit 6; Exhibit 7]; and the tank sites are historical sources of pollution [Exhibit 7 at 7 n.4; Exhibit 14 at 6; Exhibit 21 at 24:3-25:18].  In fact, BP does not even dispute that its affiliate is a successor-in-interest to the entity that owned and operated a tank site lease on the Wilcox Site.  [Exhibit 31 at 46:15-47:1].

Additionally, while BP argues that its predecessors merely owned tank site leases and rights of way on the Wilcox Site, the summary judgment evidence demonstrates that the BP predecessors were part and parcel of the operation of both the Lorraine and Wilcox Refineries.  The 1915 tank site lease pertains to feedstock used or refined crude oil produced by the Lorraine Refinery on the Church property.  [*Compare* Exhibit 36 (1915 tank site lease) *with* Exhibit 22 at 27 (Continental Refining Company operator of Lorraine Refinery from 1915 through 1917); Exhibit 15 at 000009, 000052 (Wilcox Refinery built in 1920s)].  Likewise, BP predecessors developed and operated oil pipelines on the Wilcox Site contemporaneously with the construction and expansion of the Wilcox Refinery.  [Exhibit 26 at 13 (Sinclair Refining Company operated crude petroleum pipeline beginning in 1938), 25 (Sinclair Pipe Line Company operated oil pipeline beginning in 1921); Exhibit 15 at 000009, 000052 (Wilcox Refinery built in 1920s and expanded in 1930s)].

Plaintiffs' evidence is sufficient to present a triable issue to the jury.  *See Gilliam v. Lake Country Raceway*, 24 P.3d 858, 860 (Okla. 2001).  Plaintiffs have provided documentation that BP

affiliate predecessors-in-interest owned and operated tank site leases on the Wilcox Process Area

and East Tank Farm for product used or produced by the Lorraine Refinery on the Church property,

expert testimony that the tanks had no bottoms and are historical sources of pollution, and expert

testimony that pollution migrates from parcel to parcel on the Wilcox Site.  [Exhibit 14; Exhibit

21 at 24:3-25:18; Exhibit 6].  Plaintiffs' evidence is consistent with the threshold required by the

U.S. Court of Appeals for the Tenth Circuit in historical pollution cases:

> [L]iability may be inferred from the totality of the circumstances; it need not be
> proven by direct evidence.  This is particularly true for cases involving older
> hazardous substance disposal, as eyewitness testimony or other direct evidence
> concerning specific waste disposal practices . . . during the 1940s—well before the
> enactment of environmental laws—is rarely available.
> Circumstantial evidence showing disposals of hazardous waste occurred at the
> facility during a party's ownership or operation of that facility is sufficient, if
> credited by the factfinder, to trigger liability.

*Chevron Mining, Inc. v. U.S.*, 863 F.3d 1261, 1271 (10th Cir. 2017) (internal citations and

punctuation removed); *see Tosco Corp. v. Koch Indust., Inc.*, 216 F.3d 886, 892 (10th Cir. 2000).

And, USEPA has reviewed the evidence related to the Wilcox Site and drawn a similar

conclusion to Plaintiffs, issuing special notice letters for the Wilcox Site to BP affiliates on July

28, 2014, which notified the BP affiliates that they are "responsible for the cleanup of this Site,

including all past costs incurred by the EPA in responding to releases at the Site."  [Exhibit 34;

Exhibit 35; Exhibit 26 at 21 (listing Church property (Parcel 10) among those "contaminated

parcels" "operated" and "impacted" by BP affiliate predecessor entities, including through "refined

product storage")].

Likewise, BP's attempt to argue that Plaintiffs' claims are deficient because Plaintiffs'

environmental experts are not qualified to opine on corporate law issues such as mergers,

successors, and acquisitions has no basis in Oklahoma law.  [*Motion*, 17-18].  Plaintiffs'

environmental experts opine on the nature of the contamination of the Church property, the source

of the contamination, and what must be done to abate the nuisance.  [*See* Exhibit 5; Exhibit 7].
Plaintiffs have submitted additional evidence that BP affiliates are successors-in-interest to
operators that committed the pollution.  [Exhibit 31 at 46:15-47:1; Exhibit 37; Exhibit 38; Exhibit
26 at 13-16, 21-28 ].

> ii.        *A fact question exists as to Plaintiffs' alter-ego theory.*

BP asserts that it is entitled to summary judgment because "Plaintiffs have wholly failed to
present any evidence on any of [the *Frazier*] factors . . ." necessary to establish alter-ego liability
under Oklahoma law.  [*Motion*, 22].  Not true.  Mr. Reinhart's deposition alone contains a wealth
of information concerning the relationship and function of the BP family of companies, all of
which supports the conclusion that the corporate form of the BP affiliates may be discarded by the
finder of fact.  BP cannot use the corporate form as a shield when BP does not itself adhere to
corporate formalities during its operations.

"If one corporation is simply the instrumentality of another corporation, the separation
between the two may be disregarded and treated as one for the purpose of tort law." *Oliver v.
Farmers Ins. Group of Companies*, 941 P.2d 985, 987 (Okla. 1997); *Roberson v. PaineWebber,
Inc.*, 998 P.2d 193, 201 (Okla. Civ. App. 1999).  Oklahoma law does not require a showing of fraud
to disregard the corporate form.  *Canal Ins. Co. v. Montello, Inc.*, 822 F.Supp.2d 1177, 1182 (N.D.
Okla. 2011) ("Oklahoma law is stated in the disjunctive, requiring *either* a showing fraud or that
one corporation is merely the instrumentality of another."); *Winn & Assoc., PLLC v. EmCare
Physician Providers, Inc.*, No. 13-CV-427-JHP, 2014 WL 3573416, at *4 (E.D. Okla. July 21,
2014) ("Proof of fraud is not an element under the alter ego doctrine."). [1]

---

[1] A copy of all non-published or foreign jurisdiction opinions are attached hereto as Exhibit
44.

The Supreme Court of Oklahoma has listed 10 factors that may be considered regarding alter-ego:

> (1) the parent corporation owns most or all of the stock; (2) the corporations have common officers or directors; (3) the parent provides financing to the subsidiary; (4) the dominant corporation subscribes to all the other's stock; (5) the subordinate corporation is under capitalized; (6) the parent pays the salaries, expenses or losses of the subsidiary; (7) a great deal of business is with parent corporation or assets of the former were conveyed to the other corporation; (8) the parent refers to the subsidiary as a division or department; (9) the subsidiary follows directions from the parent's officers or directors; (10) legal formalities for keeping the entities separate are observed.

*Oliver*, 941 P.2d at 987.  "Also important is commonality of purpose between the corporations." *Id.*  However, the "question hinges primarily on control."  *Id.*

"The issues posed by *Frazier* are questions for a fact finder, and will determine the management company's liability, or lack of it."  *Oliver*, 941 P.2d at 987; *see also Gilbert v. Security Finance Corp. of Oklahoma, Inc.*, 152 P.3d 165, 175 (Okla. 2006) ("It was not error for the trial court to submit the alter-ego liability issue to the jury and to instruct the jury on alter-ego liability.").  Significantly, the factors are disjunctive and non-exhaustive.  *Winn*, 2014 WL 3573416, at *4; *Frazier v. Bryan Memorial Hosp. Authority*, 775 P.2d 281 (Okla. 1989); *Mattingly Law Firm, P.C. v. Henson*, 466 P.3d 590, 595 (Okla. Civ. App. 2019) ("The list of factors is not exclusive or exhaustive and is meant merely as guidance in determining the level of control exerted . . . .").  The plaintiff need not demonstrate that every factor is present for a finding of alter-ego. *Winn*, 2014 WL 3573416, at *4.  And, the Oklahoma Supreme Court has emphasized that, under Oklahoma alter-ego law, a fact issue arises once the plaintiff presents evidence of some *Frazier* factors.   *Frazier*, 775 P.2d at 289 ("The purpose of a summary judgment motion is not to try disputed fact issues by an exchange of paperwork.").

Plaintiffs have provided evidence to demonstrate the existence of factors 1, 4, 8, 9, and 10. [*See* Exhibit 31, Exhibit 32, Exhibit 39, Exhibit 40].   In addition, Plaintiffs have submitted evidence of commonality of purpose and that BP p.l.c. controls the subsidiaries.

As to factors 1 and 4 (ownership), there is no dispute in this litigation that BP p.l.c. is the parent corporation and ultimate owner of the BP entities that are direct successors (through name change and merger) to companies that have conducted operations on and polluted the Wilcox Site and Church property.  [*See* Exhibit 39].  Each of BP Corporation North America, Inc., BP Products North America Inc., BP Pipelines (North America), Inc., and Atlantic Richfield Company are ultimately owned and controlled by BP p.l.c.  [*Id.*].

As to factor 10 (lack of legal formalities), Plaintiffs have presented significant evidence that the legal formalities for keeping the entities separate are not observed.   [Exhibit 31]. Testimony from Mr. Reinhart confirms that the BP family of companies conducts business on the basis of cross-corporation functional groups, through which the business of various BP affiliates is conducted in unison.  [*Id.* at 71:17-72:15].  Two examples of functional groups Mr. Reinhart testified exist are BP Legal and Fuels North America, each of which is an unincorporated "group" that conducts business across the BP family of companies.  [*Id.*].  The cross-corporation functional groups are not incorporated, or otherwise formed as a proper legal entity.  [*Id.*].

And, the functional groups use the mentality of "One Team" to achieve the best possible result for BP—irrespective of whether the financial interests of specific subsidiaries might diverge. [*Id.* at 187:6-188:7].  Ultimately, Mr. Reinhart testified that the business of functional groups overshadow the significance of the purportedly separate legal entities.  [*Id.* at 187:6-188:7 ("The entity itself is significant, no. The business is more significant than the entity itself, than the legal corporate entity.")].  The all-importance of the functional groups is further demonstrated by the

fact that BP Legal *considers the functional groups the clients, not the corporate entities*.  [*Id.* at 175:4-14].   The existence and pervasiveness of the cross-corporate functional groups also demonstrate commonality of purpose between the corporations, a significant factor with respect to an alter-ego determination.  *See Oliver*, 941 P.2d at 987. *Okla. Cardiovascular Assoc., PC v. Techtronic Indus. North America, Inc.*, No. CIV-08-579-R, 2009 WL 10672422, at *3 (W.D. Okla. Mar. 19, 2009) (Finally, plaintiffs have submitted evidence of the commonality of purpose—that defendants . . . and the subsidiaries collectively and interchangeably work toward the common purpose of distributing products made in China within the United States and, specifically, in Oklahoma.").

As to factor 9 (following directions from parent), Plaintiffs have introduced summary judgment evidence that BP p.l.c. and its international subsidiaries set globe-wide standards for all affiliates, subsidiaries, and functional groups to follow.   For example, BP has international standards for remediation that apply irrespective of whether contaminated property is in England, Africa, or Oklahoma. [Exhibit 31 at 176:7:21, 196:9:24; Exhibit 40].  Likewise, functional groups such as BP Legal submit their yearly budgets for international approval.  [Exhibit 31 at 43:25-44:5].  BP p.l.c.'s control over functional groups and subsidiaries is further demonstrated by the fact that Mr. Reinhart periodically represents BP p.l.c. even though he is not employed by BP p.l.c., is not aware of any agreement to share personnel between BP p.l.c. and the entity that actually employs him (or even of any compensation paid to his actual employer for the work done on behalf of BP p.l.c.), and does not believe that representing BP p.l.c. is part of his job description.  [*Id.* at 23:4-8, 27:24-29:12, 182:12-16].   In fact, BP p.l.c. has even identified Mr. Reinhart as being "Senior Counsel with BP plc" (even though Mr. Reinhart is employed by a subsidiary).  [Exhibit 32].  And, BP p.l.c. asserts that Mr. Reinhart has sent letters on behalf of BP p.l.c. related to the

Wilcox Site (even though the letters were on BP America letterhead and written concerning Atlantic Richfield Company and BP Products North America, Inc.).  [*Id.*].

Oklahoma courts and federal courts applying Oklahoma law have consistently allowed the jury to determine whether corporate entities are alter-egos where some evidence of the *Frazier* factors is presented.  *See*, *e.g.*, *Lewis v. Central Okla. Med. Group., Inc.*, 998 P.2d 202, 206 (Okla. Civ. App. Nov. 5, 1999) ("the inference is presented through this evidence that Prudential is related to and involved in the operations of PruCare.  Whether Prudential has adequate control of PruCare and ultimately vicariously liable for negligence, if any, of Prucare is a determination for the trier of fact."); *Winn & Assoc., PLLC v. EmCare Physician Prov., Inc.*, No. 13-CV-00427-JHP, 2014 WL 3573443, at *3 (E.D. Okla. July 21, 2014); *Gilbert*, 152 P.3d at 175; *Morton v. Watco Co., Inc.*, No. CIV-06-88-F, 2006 WL 1620326 (W.D. Okla. June 6, 2006).

BP cites no legal authority for its novel argument that Plaintiffs must produce evidence that Sinclair Refining Company, Sinclair Pipe Line Company, or Standard Oil Company of Indiana were alter-egos of their parent entities.  [*Motion*, 23].  And, Plaintiffs are not required to produce any such evidence to avoid summary judgment.  Plaintiffs seek an alter-ego finding in order to hold BP p.l.c. liable for ***current financial obligations*** now owed by its affiliates and subsidiaries to Plaintiffs.  The BP subsidiaries have succeeded to the assets and liabilities of their predecessors.  And, because the BP subsidiaries are now all alter-egos of BP, the BP affiliate and subsidiary liabilities may be satisfied through judgment against BP p.l.c.

## B.     Plaintiffs' Claims Are Not Barred By Limitations.

BP argues that it is entitled to summary judgment on limitations, and incorporates the argument and supporting evidence presented in Kinder Morgan Inc.'s *Motion for Summary Judgment.*  [*Motion*, 27].  Plaintiffs likewise incorporate herein the argument and supporting

evidence on limitations filed in *Plaintiffs' Response to Kinder Morgan's Motion for Summary Judgment*, and in particular Section IV.B.

### C.      Plaintiffs Have Introduced Evidence of Personal Injury.

BP challenges Plaintiffs' evidence regarding personal injury, and argues that it is entitled to summary judgment on Plaintiffs' personal injury claims.  [*Motion*, 27].  In response, Plaintiffs incorporate herein the argument filed in *Plaintiffs' Response to Defendants' Motion to Exclude the Testimony of Robert Harrison, M.D., M.P.H.*

### D.      Plaintiffs Have Carried Their Burden on Real Property Damages.

BP argues that it is entitled to summary judgment on the Church's real property claims, and incorporates the argument and supporting evidence presented in Marathon's *Motion for Summary Judgment.*  [*Motion*, 36].  Plaintiffs likewise incorporate herein the argument and supporting evidence on limitations filed in *Plaintiffs' Response to Marathon's Motion for Summary Judgment*, and in particular Section IV.B.

## V.      CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that this Court deny summary judgment and schedule this matter for trial at the first available setting.

Respectfully submitted,


*/s/ Michael K. Reer*
James Key, *Admitted Pro Hac Vice*
TX 24012958
Michael K. Reer, *Admitted Pro Hac Vice*
OBA #34074
HARRIS, FINLEY & BOGLE, P.C.
777 Main Street, Suite 1800
Fort Worth, Texas 76102
Phone: (817) 870-8700
Fax:    (817) 332-6121
Jkey@hfblaw.com
Mreer@hfblaw.com

Allan DeVore, OBA# 2328
Jandra Susanne Cox, OBA #16610
DeVore Law Firm, PLC
5709 NW 132nd Street
Oklahoma City, OK 73142
Phone: (405) 603-8585
Fax:    (877) 636-8113
allan@devorelawok.com
jandra@devorelawok.com

Michael J Blaschke, OBA# 868
Michael J Blaschke PC
3037 NW 63rd Street, Suite 251
Oklahoma City, OK 73116
Phone: (405) 562-7771
Fax:    (405) 285-9350
mblaschke@thelawgroupokc.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify that on December 3, 2020, a copy of *Plaintiffs' Response to Defendant BP p.l.c.'s Motion for Summary Judgment, and Brief in Support* was served by e-mail, as well as through the CM/ECF system, which automatically serves a Notice of Electronic Filing to each of the parties through their counsel as set forth below.

/s/ Michael K. Reer
Michael K. Reer

Stacy L Acord
sacord@ok-counsel.com
Melissa Ann East
meast@ok-counsel.com
Archer Scott McDaniel
smcdaniel@ok-counsel.com
MCDANIEL ACORD & LYTLE, PLLC
9343 E 95th Court
Tulsa, OK 74133
918-382-9200
918-382-9282 (fax)
*Counsel for Defendant, BP p.l.c.*

Bonnie A Barnett
bonnie.barnett@dbr.com
Patricia Leigh Bausinger
leigh.bausinger@dbr.com
DRINKER BIDDLE & REATH LLP
(Pennsylvania)
1 Logan Square, Suite 2000
Philadelphia, PA 19103
215-988-2916
215-988-2757 (fax)
*Counsel for Defendant, Kinder Morgan, Inc.*

Kenneth H Blakley
kblakley@elbattorneys.com
Travis Walter Brown
tbrown@elbattorneys.com
Robert Dale Edinger
redinger@elbattorneys.com
Jacqueline Gayle Stone
jstone@elbattorneys.com
EDINGER LEONARD & BLAKLEY PLLC
6301 N. Western Avenue, Suite 250
Oklahoma City, OK 73118
405-848-8300
405-605-8381 (fax)
*Counsel for Defendant, Marathon Oil Corporation and Defendant, Marathon Petroleum Corporation*

Larry D. Ottaway
larryottaway@oklahomacounsel.com
Amy Sherry-Fischer
amyfischer@oklahomacounsel.com
Andrew M Bowman
andrewbowman@oklahomacounsel.com

FOLIART HUFF OTTAWAY & BOTTOM
201 Robert S. Kerr Avenue, 12th Floor
Oklahoma City, OK 73102
405-272-4633
405-232-3462 (fax)
*Counsel for Defendant, Kinder Morgan, Inc.*

Ross Allen Lewin
ross.lewin@dbr.com
DRINKER BIDDLE & REATH LLP (New Jersey)
105 College Road E, Suite 300
Princeton, NJ 08542
609-716-6500
609-799-7000 (fax)
*Counsel for Defendant, Kinder Morgan, Inc.*