# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

BRISTOW FIRST ASSEMBLY OF GOD;
MARK S. EVANS;
CHRISTINA J. EVANS;
and Mark Evans, as father and next friend
of C.J.E. and B.K.E.,

          Plaintiffs,

v.

BP p.l.c.;
MARATHON OIL CORPORATION;
MARATHON PETROLEUM
CORPORATION;
and KINDER MORGAN, INC.,

          Defendants.

Case No.  15-CV-523-GKF-CDL

## OPINION AND ORDER

Before the court is the Motion for Summary Judgment filed by defendant Kinder Morgan,

Inc.  [Doc. 287].  For the following reasons, the motion is granted.

### I.  Background and Procedural History

Plaintiffs' claims arise out of historical oil refinery operations in Bristow, Oklahoma.

Plaintiff Bristow First Assembly of God (the Church) owns land (the Church Property) on which

defendants BP p.l.c., Marathon Oil Corporation, Marathon Petroleum Corporation, and Kinder

Morgan, Inc., or their predecessors in interest, (collectively, the Operational Defendants) allegedly

operated oil refineries.

Plaintiff Mark Evans (Pastor Evans) is the Church's pastor.  He, his wife Christina, and

their two minor children resided in the parsonage on the Church Property until the Oklahoma

Department of Environmental Quality (ODEQ) advised them it was unsafe to continue to do so.

Pastor Evans, on behalf of himself and his children, and Christina Evans initiated this litigation on June 24, 2015, in the District Court of Creek County, Oklahoma. The case was removed to federal court and plaintiffs filed an Amended Complaint. The Amended Complaint includes claims for: (1) negligence; (2) negligence per se; (3) public nuisance; (4) private nuisance; (5) unjust enrichment; (6) strict liability; (7) fraud/deceit; (8) restitution; (9) declaratory judgment/indemnification/contribution; (10) injunction; and (11) fees and costs. The Operational Defendants filed partial motions to dismiss, which the court denied in part and granted in part. [Docs. 66, 144]. The remaining claims are (1) negligence, (2) public nuisance, (3) unjust enrichment, (4) strict liability, (5) restitution, (6) declaratory judgment/indemnification/contribution, (7) injunction, and (8) fees and costs.

## II.  Summary Judgment Standard

Pursuant to Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Further, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, "[a]t the summary judgment stage, the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 242-43. A court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d

793, 796 (10th Cir. 1995).  Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(c)).

### III.  Undisputed Material Facts

The Church owns the Church Property located at 35148 W. 221st Street South, previously called Old Refinery Road, in Bristow, Oklahoma, and constructed church buildings on it.  [Doc. 287, ¶ 1].  The Church Property was formerly the site of the Lorraine Refinery, which was located on the west side of the tracks of the St. Louis and San Francisco Railroad.  [*Id.*, ¶ 4].  The Wilcox Refinery was located nearby on property east of the railroad right-of-way.  [*Id.*].  Both historical refinery locations are part of the Wilcox Oil Superfund Site.  [*Id.*, ¶ 14].

The Lorraine Refinery commenced operations in or about 1915 and was operated by a series of companies, specifically, the Bristow Oil and Refining Company, the Continental Refining Company, the Lorraine Petroleum Company, the Lorraine Refining Company, Interocean Oil Company, and Producers Oil Company.  [*Id.*, ¶ 5].  By 1937, the Lorraine Refinery had ceased operations and been dismantled.  [*Id.*, ¶ 6].  On June 25, 1937, Wilcox Oil Company (Wilcox) acquired a seven-acre portion of the then-vacant Lorraine Refinery property.  [*Id.*, ¶ 7].  Over the next four decades, that seven-acre parcel was conveyed to and from various entities and individuals, until it was gifted to the Church in September 1980.  [*Id.*, ¶ 8].

On September 7, 1965, Wilcox merged into Tenneco Oil Company (Tenneco Oil).  [*Id.*, ¶ 15].  Both companies were Delaware corporations.  [*Id.*].  Tenneco Oil ceased operations in 1988, and its operating assets were sold to third parties.  [*Id.*, ¶ 16].  In late 1996, Tenneco Oil's parent,

Tenneco, Inc., was acquired by and became an indirect subsidiary[1] of El Paso Natural Gas Company (EPNG).  [*Id.*, ¶ 17].  At that time, Tenneco Oil (then inactive) changed its name to EPEC Oil Company (EPEC Oil).  [*Id.*].  In December 1998, EPEC Oil sought dissolution pursuant to Section 281(b) of the Delaware General Corporation Law and created a Liquidating Trust to address certain obligations and claims properly payable by EPEC Oil.[2]  [*Id.*, ¶¶ 18-19].  In 2012, Kinder Morgan acquired EPNG's parent company, El Paso Corporation, when Kinder Morgan acquired and/or merged with El Paso Corporation.  [*See id.*, ¶ 22; Doc. 301, pp. 10, 24].[3]

In 2012, the Church hired Mark Evans to serve as its pastor.  [Doc. 287, ¶ 2].  Pastor Evans, his wife Christina Evans, and their two minor children, C.J.E. and B.K.E., moved into the parsonage.  [*Id.*].  They lived there for thirteen months, from June 2012 to June 2013.  [*Id.*].

In July 2013, Pastor Evans drafted a memo (the Evans Memo) summarizing thirteen (13) areas of potential contamination observed by church members over the preceding years.  [*Id.*, ¶¶ 25-26].  The Evans Memo detailed extensive refinery-related buried piping (some of which actively seeped oil when broken during Church construction), two abandoned underground pumping manifolds/stations, tar pits that the Church attempted to cover but are still a source of surface seepage, exposed concrete debris, and an old contaminated well.  [*Id.*, ¶ 27].  The Evans Memo also recorded church members' observations of crude oil seepage through the cracks of the old refinery concrete slabs as the Church foundation was poured on top of those slabs.  [*Id.*].

---

[1] "Indirect subsidiary" implies that additional levels of corporate subsidiaries stood between Tenneco, Inc., and EPNG. *See, e.g., Birmingham v. Experian Info. Sols., Inc.*, 633 F.3d 1006, 1014 (10th Cir. 2011) (stating that an indirect subsidiary is a subsidiary "separated from the parent by one or more levels of intermediate subsidiaries.").

[2] Plaintiffs dispute whether that dissolution was properly completed.  [*See* Doc. 301, p. 9].

[3] Kinder Morgan and plaintiffs disagree as to whether this constituted a merger or acquisition.  [*See* Doc. 301, p. 10].

Three former Church pastors (Terry Dorsey, Dale Floyd, and Doug Sampley), former Church Deacon Dale Allen, and Pastor Evans each testified in depositions to their knowledge of the contamination of the Church Property. [*Id.*, ¶ 28].

Terry Dorsey served as the Church's pastor from March 1984 through December 1987. [*Id.*, ¶ 29]. As pastor, he led the Board of Deacons, held broad responsibilities related to the Church's business matters, and was authorized to sign business and financial documents on the Church's behalf. [*Id.*]. Pastor Dorsey knew that the Church was located on Old Refinery Road. [*Id.*, ¶ 30]. All the men in leadership at the Church during his tenure worked in the oil industry and discussed that the Church Property was previously a refinery site. [*Id.*]. Pastor Dorsey testified that "you didn't have to look very far" to see site conditions created by refinery operations, including old tank sites, old rusty pipes coming out of the ground, old concrete formations, and an old well, all in close proximity to the Church building. [*Id.*]. Pastor Dorsey further testified to seeing signs of spilled oil and "oil field remains" where the Church was built. [*Id.*].

Pastor Dorsey determined the Church could not use the property behind the Church building and did not allow children in that area. [*Id.*, ¶ 32]. According to Pastor Dorsey, the off-limits area covered the majority of the Church's land. [*Id.*]. He explained at deposition that he and the Church deacons "made a blanket decision in leadership that it would be dangerous on several levels to let the children be involved, both from safety and because of what everybody knew that was. I mean, I – I was surrounded by oil field people [the deacons]. And they all knew the harms and dangers of all that. So they just basically said 'absolutely not; children should never be on that property.'" [*Id.*].

Dale Floyd served as pastor of the Church from February 1991 through June 1995. [*Id.*, ¶ 33]. As pastor, he was responsible for directing the Church and had the general authority to bind

the Church in business and financial arrangements.  [*Id.*].  Pastor Floyd also served as chairman of the Church Board of Deacons.  [*Id.*].

Pastor Floyd knew that the Church was located on Old Refinery Road and that the property was previously used for an industrial purpose related to the oil industry, although he did not specifically know it was a former refinery.  [*Id.*, ¶ 34].  Pastor Floyd knew that the Church Property was contaminated during his tenure but did not know the source of the contamination.  [*Id.*, ¶ 35]. He observed barren and tarry areas, continuous black and orange oily seeps working their way towards the creek, and discoloration in the creek "like you'd pour a quart of oil in the water."  [*Id.*]. There was so much tarry waste on a hill between the Church and the parsonage that one of the deacons built stairs leading up the hill so that the pastor's children would not fall on the slick seepage.  [*Id.*].  Pastor Floyd also knew about an old well on the property with well water contaminated with oil.  [*Id.*, ¶ 36].  The well smelled "very, very strongly" of oil, and "you could feel the oil and you could even see the black sometimes."  [*Id.*].  Pastor Floyd also recalled that, when he constructed the tractor barn behind the parsonage building, oily residue and seepage filled in the holes he dug to install poles.  [*Id.*, ¶ 37].

Pastor Floyd's observations led him to contact the government in December 1994, and on December 16, 1994, David Cates of ODEQ visited the Church Property.  [*Id.*, ¶ 38].  Mr. Cates documented this visit in a memo subsequently included as an exhibit to ODEQ's Preliminary Assessment of the Wilcox Oil Company (the 1994 Preliminary Assessment), which Cates authored.  [*Id.*].  Pastor Floyd reported the visit by ODEQ to the Board of Deacons but did not follow up with ODEQ.  [*Id.*, ¶ 40].

Doug Sampley served as the senior pastor of the Church from August 1995 to 2007.  [*Id.*, ¶ 41].  During his tenure, Pastor Sampley knew the Church Property was part of an old refinery.

[*Id.*, ¶ 42].  He testified that he personally observed a deacon, Dale Allen, remove a pump from a well on the Church property "dripping" with what appeared to be oil.  [*Id.*, ¶ 43].  Pastor Sampley also signed an access agreement with the United States Environmental Protection Agency (EPA) on July 8, 1996, granting EPA contractors access to the Church Property for an Expanded Site Inspection.  [*Id.*, ¶ 45].  Even though the EPA offered to provide the Church with the resulting report and data obtained from the site visit, Pastor Sampley did not recall making any effort to obtain the report or data.  [*Id.*, ¶ 46].

Dale Allen joined the Church in June 1986 and served on the Church's Board of Deacons for twelve years, beginning in 1988.  [*Id.*, ¶ 47].  Allen did plumbing work on the Church Property, and when he cleaned out the Church's water treatment system, he would find a gallon or two of what appeared to be crude oil or "motor oil that you would take out of a car that's been sitting for 20 years."  [*Id.*, ¶ 48].  Allen testified at deposition: "we were getting so much oil or this oily substance out of the well to . . . endanger[] our parishioners, our people in church," and "I didn't think it would be right to drink that, and I told the board."  [*Id.*, ¶ 49].  The board approved the closure of the well.  [*Id.*].  When Allen pulled the well pump out, it had a black oily substance on it that he knew did not result from Church operations.  [*Id.*, ¶ 50].

Allen further testified that, in approximately 1991, he called the Oklahoma Energy Resources Board (OERB) to report pipes and cement on the Church Property that he observed while installing a water line.  [*Id.*, ¶ 51].  Allen also recalled Pastor Floyd calling him in 1994 and asking him why there were "people on the property with white clothes on, hazard suits."  [*Id.*].  Allen told Pastor Floyd that either OERB or EPA told him to cap the well on the Church Property and that they were doing some inspections on the land.  [*Id.*].  Allen also knew that the City

encountered a two-foot steel line leaking crude while installing the water line to provide water service to the Church.  [*Id.*, ¶ 52.]

Allen reported that "[s]tained soil is all around [the Church Property] and runoff always has a sheen."  [*Id.*].  In April 2008, Mr. Allen told ODEQ that he observed approximately four inches of crude oil in a pipeline that was uncovered when a water line was installed on the Church Property.  [*Id.*, ¶ 53].  Mr. Allen also testified that when holes were dug on the Church Property in the springtime, they would fill with water with an oil sheen floating on top.  [*Id.*]

After taking over the Church, Pastor Evans testified that, in April 2013, his son emerged from playing in the creek on the Church Property with his shoes and hands stained "black," and the stains did not look like dirt.  [*Id.*, ¶ 54].  Pastor Evans wrote that his son returned home "with his shoes completely covered in oil tar residue."  [*Id.*; Doc. 287-19, ¶ 13].  Mrs. Evans also witnessed the "black crud" on her son's shoes and asked her husband to investigate its source.  [*Id.*, ¶ 55].  When Pastor Evans went to examine the creek, he observed a "translucent, oily or a soapy substance on top of the water" and noticed a similar substance dripping from the Church side of the creek bank.  [*Id.*, ¶ 56].  He later described it as a "black residue" that smelled like petroleum, "like something . . . at a gas station."  [*Id.*].  Pastor Evans told his son not to play in the creek anymore because "[t]here's something wrong."  [*Id.*, ¶ 57].

A few weeks later, Pastor Evans and Mrs. Evans discovered their children had been playing in the backyard of the parsonage and had smeared themselves with a "sticky tarry-like substance" from under the trampoline.  [*Id.*, ¶ 58].  When Mrs. Evans tried to scrub the substance off the children, she noted its stickiness and "knew it wasn't just dirt."  [*Id.*, ¶ 59].  Pastor Evans instructed his children to stay away from that area.  [*Id.*].  This incident caused Mrs. Evans more than the

typical level of parental concern, and she again asked her husband to investigate the substance and its source.  [*Id.*, ¶ 60].

Pastor Evans testified that the conditions in the creek and backyard caused him to call the OERB around "the end of April, beginning of May [2013]."  [*Id.*, ¶ 61].  The OERB referred Pastor Evans to the Oklahoma Corporation Commission (OCC), which sent someone to visit the Church Property at the end of May or beginning of June.  [*Id.*].  During that visit, the OCC representative walked the Church Property with Pastor Evans and pointed out evidence of "tarry" substances and "black stuff coming up around the property . . . that needed to be . . . addressed."  [*Id.*, ¶ 62].  Pastor Evans testified that that visit "was [his] first time recognizing it as a problem."  [*Id.*].

Following the OCC visit, Pastor Evans had a number of phone conversations with both the EPA and ODEQ during May and early June 2013.  [*Id.*, ¶ 63].  During those conversations, Pastor Evans was informed that the EPA was involved and knew about the site and that the government had performed prior studies on the property.  [*Id.*].  ODEQ's Todd Downham informed Pastor Evans that, over the years, they had tested the soil in the area as well as the creek water.  [*Id.*].  Downham also testified that, prior to May 24, 2013 (when the EPA proposed the listing of the Wilcox Oil Company Superfund Site), he talked to representatives of the Church more than once regarding the investigation by ODEQ and the EPA into the contamination on the Church Property and to gain permission to access the property to facilitate that investigation.  [*Id.*, ¶ 65[4]].

Mrs. Evans testified that her husband kept her updated regarding his efforts to determine what was going on at the property.  [*Id.*, ¶ 64].

---

[4] Though plaintiffs dispute this paragraph [Doc. 301, p. 11], the citations they rely upon do not reveal a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(e).

## IV.  Discussion

Kinder Morgan seeks summary judgment on the following grounds: (1) Kinder Morgan is not the successor to any Wilcox liabilities; (2) all claims by the Church, Pastor Evans, and Mrs. Evans are barred by the statute of limitations; (3) Kinder Morgan cannot be found liable in tort for contamination on the Church Property; and (4) plaintiffs have not established claims for personal injury, damage to real property, or punitive damages as a matter of law.

### A.  Liability for Wilcox Obligations

Kinder Morgan first argues that it is not a successor to the liabilities of Wilcox.  [Doc. 287, p. 20].  Kinder Morgan does not dispute that any liabilities of Wilcox were carried forward to EPEC Oil f/k/a Tenneco Oil.  [*See* Doc. 313, p. 6].  Thus, for purpose of determining liability, the court will focus its analysis on the relationship between EPEC Oil and Kinder Morgan.  The corporate history of these companies is briefly summarized below.

At the time of the merger between Wilcox and EPEC Oil (then known as Tenneco Oil), EPEC Oil was a subsidiary of Tenneco, Inc.  [Doc. 287, ¶¶ 15, 17; *see* Docs. 287-11, 287-12]. Tenneco, Inc., was subsequently acquired by and became an indirect subsidiary of El Paso Natural Gas Company (EPNG), a corporation.  [Doc. 287, ¶ 17].  El Paso Corporation was the parent company of EPNG.  [*Id.*, ¶ 22].  In December 1998, EPEC Oil sought dissolution pursuant to Del. Code tit. 8, § 281(b) and subsequently established a Trust to pay certain obligations and claims properly payable by EPEC Oil.  [*Id.*, ¶¶ 18-20].  In 2012, Kinder Morgan acquired EPNG's parent company, El Paso Corporation, when Kinder Morgan acquired and/or merged with El Paso Corporation.  [*See id.*, ¶ 22; Doc. 301, pp. 10, 24].

Both parties address at length whether EPEC Oil was properly dissolved under Delaware law.  The parties *agree*, however, that dissolution of EPEC Oil and the establishment of the Trust— even if proper—did not discharge EPEC Oil's liabilities related to the Wilcox Site.  [Docs. 301, p.

21; 313, p. 6]. Thus, the issue is whether EPEC Oil's liabilities may be attributed to Kinder Morgan based on either (1) corporate successorship; or (2) veil piercing.

### 1. Liability Based on Corporate Successorship

Plaintiffs take the position that Kinder Morgan is liable because EPEC Oil is liable and Kinder Morgan acquired EPEC Oil's parent company, El Paso Corporation. [Doc. 301, pp. 23-25]. Kinder Morgan argues that a theory of common law corporate successorship "is not appropriate here." [Doc. 287, pp. 15]. Kinder Morgan is correct that common law successorship liability generally focuses on asset sales. *See Equal Employment Opp. Comm'n v. Roark-Whitten Hosp. 2, LP*, 28 F.4th 136, 14-47 (10th Cir. 2022). Plaintiffs do not assert that an asset sale occurred, nor do they assert a common law corporate successorship theory in their response to Kinder Morgan's motion for summary judgment.

It is a principle of corporate law "deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (citation omitted). Plaintiffs allege that "Wilcox became Tenneco, which became El Paso, which became Kinder Morgan," [Amended Complaint, Doc. 68, n. 4], but do not advance any cognizable legal theory that would make El Paso—and by extension Kinder Morgan—legally responsible for the liabilities of its indirect subsidiary EPEC Oil. Plaintiffs argue only that El Paso was EPEC Oil's "ultimate parent"—a characterization that, in and of itself, acknowledges that levels of corporate structure stand between the two entities—and that El Paso's directors and owners cannot claim insulation from liability on the basis of the dissolution if EPEC Oil did not properly dissolve. [*See* Doc. 301, pp. 24-25]. However, "Delaware public policy does not lightly disregard the separate legal existence of corporations." *BASF Corp. v POSM II Props. P'ship*, 2009 WL 522721, at *8 n.50 (Del. Ch. Mar. 3, 2009). And even if EPEC Oil did not properly

dissolve, plaintiffs provide no authority for the proposition that a failed corporate dissolution independently justifies holding Kinder Morgan liable for EPEC Oil's liabilities.

### 2. Liability based on Veil Piercing

Because Kinder Morgan is incorporated in the state of Delaware, the veil piercing issue is evaluated under Delaware law. *See Tomlinson v. Combined Underwriters Life Ins. Co.*, No. 08-CV-259-TCK-(FHM), 2009 WL 2601940, at *3 (N.D. Okla. Aug. 21, 2009). While "persuading a Delaware Court to disregard the corporate entity is a difficult task," *Mason v. Network of Wilmington, Inc.*, 2005 WL 1653954, at *2 (Del. Ch. July 1, 2005) (citation omitted), Delaware courts recognize two instances in which it is appropriate. A parent corporation can be held liable for the acts of its subsidiary (1) where a parent corporation has acted as the subsidiary's agent in the course of a particular transaction; or (2) where corporate veil piercing is appropriate. *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *8-9 (Del. Ch. Aug. 26, 2005). Plaintiffs do not argue Kinder Morgan acted as EPEC Oil's agent.

Factors to be considered in determining whether piercing the corporate veil is appropriate include: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a façade for the dominant shareholder." *Doberstein v. G–P Indus., Inc.*, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015) (quoting *MicroStrategy Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2010)). Under Delaware law, the "ultimate decision regarding veil-piercing is largely based on some combination of [the enumerated factors], in addition to 'an overall element of injustice or unfairness.'" *Manichaean Cap., LLC v. Exela Tech, Inc.*, 251 A.3d 694, 707 (Del. Ch. May 25, 2021); *see Mason*, 2005 WL 1653954, at *2-3. Plaintiffs

12

did not adequately plead facts to support a standard veil piercing theory of liability in their Amended Complaint.

Despite not pleading facts to support a standard veil piercing claim, plaintiffs argue that veil piercing is nonetheless appropriate because "summary judgment evidence demonstrates both public wrong and contravention of law." [Doc. 301, p. 25]. Plaintiffs' "public wrong" argument is effectively that veil piercing is appropriate because this case involves an alleged public nuisance—the pollution on the Church Property. However, veil piercing is not automatically warranted any time a case involves general harm to the public. Rather, the public wrong must be tied to the structure of corporate entities at issue. *See Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del. Super. Ct. 1996). The relevant inquiry related to public wrong and contravention of law, for purposes of veil piercing, is whether "*the separate corporate existence* of [an] entit[y] constituted a fraud or public wrong, or was in contravention of law." *eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *28 (Del. Ch. Sept. 30, 2013) (emphasis added); *see also Outokumpu Eng'g Enters., Inc.*, 685 A.2d at 729 (veil piercing "requires that the *corporate structure* cause fraud or similar injustice" (emphasis added)). Plaintiffs have offered no evidence that the asserted public wrong—the pollution on the Church Property—was caused by fraud or some improper manipulation of the corporate structure.

Plaintiffs' contravention of law argument is similarly flawed. It returns the focus to EPEC Oil's alleged failure to fully comply with Delaware's dissolution procedures. [Doc. 301, pp. 25-26]. However, even if EPEC Oil did not properly dissolve, plaintiffs do not explain how this alone would subject Kinder Morgan to liability. Plaintiffs include a single sentence in their response in opposition arguing that "the corporate parents of EPEC siphoned off company funds contemporaneously with dissolution in the amount of $93 million, which is sufficient grounds for

13

piercing the corporate veil under Delaware law." [Doc. 301, p. 26]. But plaintiffs provide no evidentiary citation in support of the assertion that the $93 million transfer was made in violation of Delaware's dissolution procedures. Nor do they argue that Kinder Morgan—or El Paso—were involved in the alleged siphoning. Plaintiffs also do not argue or offer evidence that they, at any time, attempted to bring a claim to recover from the allegedly defective Trust or contest the dissolution in Delaware Chancery Court.

The court finds that Kinder Morgan has shown that there is no genuine dispute as to any material fact relating to Kinder Morgan's responsibility for the liabilities of EPEC Oil.[5] Accordingly, Kinder Morgan is entitled to summary judgment on this basis.

### B. Statute of Limitations

#### 1. Applicable Statute of Limitations

Oklahoma statutes establish a two-year statute of limitations for an action for trespass upon real property, for injuring personal property, and for injury to the rights of another not arising on contract. Okla. Stat. tit. 12, § 95(A)(3). Kinder Morgan argues that the Church's and Pastor's and Mrs. Evans's claims for negligence, public nuisance, unjust enrichment, strict liability, restitution, declaratory judgment/indemnification/contribution, injunction, and fees and costs are all subject to this two-year limitations period. The parties agree that the personal injury claims of C.J.E. and B.K.E., both of whom were minor children when the case began, are not time-barred. Plaintiffs argue that their claims are not time-barred and that their public nuisance claim is not subject to a two-year statute of limitations.

---

[5] Plaintiffs also point to a letter sent by the EPA to Kinder Morgan "to notify Kinder Morgan, Inc. of its potential liability at the Wilcox Oil Superfund Site." [See Doc. 301, p. 27; Doc. 301-23]. However, the court is not persuaded that this letter notifying Kinder Morgan of potential CERCLA liability—a claim not raised in this action—is relevant to the veil piercing analysis here.

Okla. Stat. tit. 50, § 7 contains an exception to the two-year statute of limitations in the case of a public nuisance involving a public right; it established that "no lapse of time can legalize a public nuisance, amounting to an actual obstruction of public right."  However, as this court has previously noted, "while 50 O.S. § 7 applies to abatement claims, it 'does not suspend the operation of the statute of limitations on a claim for *damages* caused by a public nuisance which obstructs a public right for as long as the nuisance exists.'"  *Evans v. Asarco*, 2010 WL 711193, at *5 (N.D. Okla. Feb. 24, 2010) (emphasis added) (citation omitted).[6]  Kinder Morgan does not argue that actions seeking abatement are subject to a two-year statute of limitations but argues instead that, in this case, the undisputed facts establish that abatement is not an available remedy because, even if the plaintiffs prevail on their public nuisance claim, the damage to the land is permanent.

By definition, permanent damages are "reasonably incapable of abatement."  *Burlington N. & Santa Fe. Ry. Co. v. Grant*, 505 F.3d 1013, 1027 (10th Cir. 2007).  "An injury is deemed temporary, and not permanent, if it is reasonably abatable, that is, capable of being corrected by a reasonable expenditure of money within a reasonable period of time."  *Id.*  In the Amended Complaint, plaintiffs allege "permanent damage will remain after the cleanup of the temporary damage has been completed."  [Doc. 68, ¶ 31.].  Plaintiffs' experts reach the same conclusion.  [*See* Doc. 287-4 [213:06-214:11]; Doc. 287-8 [200:15-201:08]].

Oklahoma law is well-established that "when the cost of repairing the injury is greater than the diminution in the land's value, the latter is the true measure of damages."  *Burlington*, 505 F.3d at 1028.  Because plaintiffs have offered no evidence from which the court could conclude that they would be entitled to abatement, the two-year limitations period applies to plaintiffs' public nuisance claim.

---

[6] *Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 895 (10th Cir. 2000)—relied upon by the plaintiffs—does not conflict with the *Evans* decision—it simply held that the statute of limitations does not apply to abatement actions.

## 2. Timeliness of Plaintiffs' Claims

Oklahoma has adopted the discovery rule to determine when a cause of action accrues. Oklahoma's discovery rule applies the standard notion that the statute of limitations does not run "until an injured party knows of, or *in the exercise of reasonable diligence*, should have known of or discovered the injury, and resulting cause of action." *Weathers v. Fulgenzi*, 884 P.2d 538, 541 (Okla. 1994) (quoting *Lovelace v. Keohane*, 831 P.2d 624, 629 (Okla. 1992)).  As summarized by the Oklahoma Supreme Court in *Daugherty v. Farmers Co-Op Ass'n*, 689 P.2d 947, 950-51 (Okla. 1984),

> Properly limited, a discovery rule should encompass the precept that acquisition of sufficient information which, if pursued, would lead to the true condition of things will be held as sufficient knowledge to start the running of the statute limitations.  [Citation omitted]. This rule obtains because a reasonably prudent person is required to pursue his claim with diligence. Statutes of limitation were not designed to help those who negligently refrain from prosecuting injuries plainly suggested by the facts. *A plaintiff is chargeable with knowledge of facts which he ought to have discovered the exercise of reasonable diligence.*

The key inquiry here is whether, as a matter of law, plaintiffs knew—or should have known with the exercise of reasonable diligence—of the land's condition and resulting causes of action more than two years before filing this action in state court on June 24, 2015.

"Whether an action is barred by the applicable statute of limitations is a question of fact to be determined by considering the evidence in each case." *Miller v. Glaxosmithkline*, 2005 WL 8174802, at *2 (N.D. Okla. Jan. 27, 2005).  The party asserting the statute of limitations as a defense has the burden to present evidence reasonably tending to establish the time bar; summary judgment on a statute of limitations defense is therefore only appropriate "when there is no genuine issue of material fact as to when the statute of limitations began to run." *Id.*  Plaintiffs have the burden of showing a genuine issue of material fact that they did not know, or could not have known

with the exercise of reasonable diligence, of the land's condition and resulting causes of action more than two years before filing this action in state court on June 24, 2015. *See id.* at *3.

Because the damage to the land is alleged to be permanent (as discussed above), the Church and Pastor and Mrs. Evans must have commenced their action "within two years from the time it became apparent to them, or would be apparent to a reasonable person under the same circumstances, that the injury was permanent[.]" *Harper-Turner Oil Co. v. Bridge*, 311 P.2d 947, 950 (Okla. 1957).

As to the Church, the record establishes that Church leadership—including multiple pastors and the Board of Deacons—knew about the visible contamination on the Church Property, including oily discharges, water sheen, and debris, for decades prior to filing this suit:

- Pastor Dorsey (1984 – 1987) testified that the church building was placed where there were oil field remnants, including tanks and signs of old oil spills. He and his board "all knew it was an old refinery." And he and the other church leaders were concerned enough about the condition of the land even then that they declared most of the Church property off-limits for use. [Doc. 287, ¶¶ 29-32].

- Pastor Floyd (1991 – 1995) knew the Church was located on Old Refinery Road; knew that it had previously been used for an industrial purpose related to the oil and gas industry; and personally observed barren and tarry areas, continuous black and orange oily seeps working their way towards the creek, and discoloration in the creek "like you'd pour a quart of oil in the water." In fact, he was so concerned by what he observed on the Church Property that he called the government, and in December 1994—over twenty years before this action was filed—ODEQ came to examine the property. [*Id.*, ¶¶ 33-38].

- Pastor Sampley (1995 – 2007) knew the Church Property previously contained a refinery and signed an access agreement to allow EPA contractors to access the property and conduct an Expanded Site Inspection. However, even though the EPA offered to provide the Church with the findings and data in that report, Pastor Sampley made no effort to obtain the report or data. [*Id.*, ¶¶ 42-46].

- Deacon Dale Allen completed plumbing work on the Church Property and observed that, when cleaning out the Church's water treatment system, he would find a gallon or two of a substance with the appearance of crude oil or "motor oil that you would take out of a car that's been sitting for 20 years." The Church Board closed the Church well based on his recommendation. [*Id.*, ¶¶ 47-48].

- Pastor Evans, within a year after taking over the church in 2012, experienced two incidents with his children related to the land condition, discussed further below.  First, in April 2013, his son came home from the creek covered in what appeared to be "oil tar residue," and a few weeks later, both his children came home smeared in a "sticky tarry-like substance."  Pastor Evans instructed his children to stay away from the area.  His wife was so concerned by these events that she, at the end of April or beginning of May 2013, had him reach out to the OERB, which referred him to the OCC, which then sent representatives to the Church Property at the end of May or early June.  During that visit, the OCC representative pointed out evidence of "tarry substances" and "black stuff" on the property requiring attention.  Pastor Evans then had multiple conversations with the EPA and ODEQ during May and early June 2013.  [*Id.,* ¶¶ 58-64].

Given these undisputed facts, it is clear that the Church knew—or, at a minimum, should have known with the exercise of reasonable diligence—the condition of the land before June 23, 2013. Likewise, the sheer magnitude of contamination observed over decades prior to this suit was such that the Church also knew or should have known the permanent nature of the damage caused by oily pollution.  As Kinder Morgan notes, "to the extent Plaintiffs did not understand the permanency of the damage, they need only have referred to the government reports, which laid out the extent of the contamination" and were available long before June 23, 2013.  [Doc. 313, p. 18]. In light of the visible contamination, a request for and review of those reports would have been an exercise in reasonable diligence.  Thus, the Church knew or should have known about the contamination and the permanent nature of the damages to the Church property by June 23, 2013, and the Church's claims against Kinder Morgan are time-barred.

Pastor Evans also knew or should have known about the permanent nature of the damages to the Church Property prior to June 23, 2013.  In April 2013, Pastor Evans's son came out of the creek on the Church Property with his shoes and hands stained "black"—Pastor Evans later wrote that his son returned home "with his shoes completely covered in oil tar residue, similar to that which is emerging from the old tar pits."  [Doc. 287, ¶ 54].  Pastor Evans also observed "black

residue" that smelled like petroleum dripping from the Church side of the creek bank. [*Id.*, ¶ 56].

In response to the following questions at his deposition, the Pastor gave the following answers:

> Q: And the drip itself, was this black material you had gotten your hands on?
>
> A: Yes. It was consistent with the same stuff that was floating on the water.
>
> Q: Right. And when you pulled your hands out, what was on them?
>
> A: It just looked -- it was -- it was black. It was black residue. I don't know what it was. But I did notice the smell of it when I did this (indicating), and that's when I said, you know, there's something wrong with this.
>
> Q: What did it smell like?
>
> A: Petroleum.
>
> Q: Yeah. So by that point, you put two and two together and you had some sense that there was some oily residue coming out of the side of the bank?
>
> A: Yeah. And honestly, my thought was somebody has dumped here. Like, I was thinking gas station or something like that, like, maybe had dumped over, you know, something, you know, because it smelled like something I would smell at a gas station.

[Doc. 287-2, 88:11-89:08].

The Pastor's observations concerned him enough that he instructed his son to stay away from the creek because "there's something wrong." [*Id.*, ¶ 57]. Then, a few weeks later, the Evans children came in from the backyard of the parsonage smeared with a "sticky tarry-like substance" from under the trampoline. [*Id.*, ¶ 58]. Pastor Evans instructed his children to stay away from that area. [*Id.*, ¶ 59]. Christina Evans was so concerned about these incidents that Pastor Evans reached out to the OERB at "the end of April, beginning of May [2013]." [Doc. 287, ¶ 61]. The OERB referred Pastor Evans to the OCC, and the OCC sent someone to walk the property with Pastor

Evans.  During the visit, which occurred at the end of May, or beginning of June, the OCC pointed out evidence of "tarry" substances and "black stuff coming up around the property, and that needed to be . . . addressed."  [*Id.*, ¶¶ 61-62].  Following the OCC visit, Pastor Evans had multiple conversations with both the EPA and ODEQ during May and early June, a timeframe he remembered vividly because it coincided with the death of his grandfather.  [*Id.*, ¶ 63].  During those conversations, Pastor Evans was informed that the EPA was involved and knew about the site, and that the government had performed prior studies on the property.  [*Id.*].

Based on the undisputed facts, Pastor Evans had acquired sufficient information in April, May, and early June 2013 which, if pursued, would have led to the true condition of things.  Pastor Evans therefore had sufficient knowledge to start the running of the two-year statute of limitations prior to June 23, 2013.

Similarly, Mrs. Evans witnessed the "black crud" on her son's shoes in April 2013 and asked her husband to investigate.  [*Id.*, ¶ 55].  A few weeks later, she saw her children come in from the backyard smeared with a "sticky tarry-like substance."  [*Id.*, ¶ 58].  She "knew it wasn't just dirt" when she tried to scrub the substance off the children and was so concerned that she asked her husband to investigate the substance and where it came from.  [*Id.*, ¶¶ 59-60].  Mrs. Evans also testified that her husband kept her updated regarding his efforts to determine what was going on at the property.  [*Id.*, ¶ 64].  Accordingly, based on Mrs. Evans's experience with her children and the fact that her husband kept her informed about his own efforts to learn about the property and its condition—efforts that, as discussed above, put him on notice of the true condition of things prior to June 23, 2013—the court concludes that Mrs. Evans also knew or should have known of the contamination and its permanent nature prior to June 23, 2013.

This court finds that Kinder Morgan has met its burden of showing that no genuine issue of material fact exists, and that the claims of the Church, Pastor Evans, and Mrs. Evans are barred by the two-year statute of limitations.

### C. Tort Claims

For its third argument, Kinder Morgan contends it cannot be found liable in tort for contamination on the Church Property.

#### 1. Public Nuisance

Pursuant to 27A Okla. Stat. §2-6-105(A), "[i]t shall be unlawful for any person to cause pollution of any waters of the state or to place or cause to be placed any wastes in a location where they are likely to cause pollution of any air, land or waters of this state. Any such action is hereby declared to be a public nuisance."  Under Oklahoma law, in relevant part, "a nuisance [public or private] consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either" "[a]nnoys, injures or endangers the comfort, repose, health, or safety of others" or "[u]nlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake or navigable river, stream, canal or basin, or any public park, square, street or highway" or "[i]n any way renders other persons insecure in life, or in the use of property."  Okla. Stat. tit. 50, § 1.  A public nuisance is "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal."  *Id.* § 2.

Under Oklahoma law, a successor landowner may be entitled to pursue a claim for public nuisance against a predecessor responsible for pollution. *See Moore v. Texaco, Inc.*, 244 F.3d 1229, 1231 (10th Cir. 2001).  Plaintiffs' public nuisance claim against Kinder Morgan fails because plaintiffs fail to show that Wilcox caused any pollution or damage to the Church property.  *See Id.*, at 1232 (granting summary judgment in favor of defendant when plaintiff "failed to produce

evidence, sufficient to survive summary judgment, that any act or omission by [the prior landowner] caused a public nuisance.").[7]

The evidentiary materials produced on summary judgment show that, by the time Wilcox purchased the property in 1937, the Lorraine Refinery had been torn down. Plaintiffs, however, rely on a statement by David Cates in ODEQ's 1994 Preliminary Assessment to contest the factual assertion that "no refinery facilities were on the Church property from 1937 to present." [Doc. 301, p. 8-9]. The full quote from the Preliminary Assessment is "[i]t is *assumed* that Wilcox Oil Company expanded operations at some later date since they acquired the former Lorraine Refinery Facility west of the railroad and tank farm area to the east." [Doc. 287-24, p. 5 (emphasis added)]. During his March 15, 2018, deposition, Mr. Cates was shown aerial photographs of the area from 1937, which is the year property records indicate Wilcox purchased the property on the west side of the railroad tracks. [*See* Doc. 313-7, 59:11-60:06]. He did not recall whether he had access to the 1937 aerial photographs at the time of his 1994 report. [*Id.*, 60:24-61:03]. When asked, Mr. Cates acknowledged that, based on his review of the 1937 aerial photograph, there was "no information that [his] assumption [that Wilcox expanded operations] is correct" and that "no one should rely on [his] assumption or come to that conclusion unless they were able to obtain specific information establishing that Wilcox Oil Company operated on the former Lorraine refinery site." [*Id.*, 61:04-61:19]. Plaintiffs have presented no other evidence for the proposition that Wilcox ever expanded its operations west of the railroad tracks or caused pollution to the Church Property. Kinder Morgan is therefore granted summary judgment on plaintiffs' claim of public nuisance.

---

[7] Plaintiffs cited several cases in support of their argument that Kinder Morgan should be held liable for a public nuisance. *See Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886 (10th Cir.2000); *Burlington Northern and Santa Fe Railroad Company v. Grant*, 505 F.3d 1013 (10th Cir. 2007); *Blocker v. ConocoPhillips Co.*, 380 F.Supp.3d 1178 (W.D. Okla. 2019); and *Meinders v. Johnson*, 134 P.3d 858 (Okla. 2005). Each of those cases is distinguishable, however, because, where courts found a public nuisance the defendants and/or their predecessors in interest had acted in some way to create the nuisance at issue.

### 2. Negligence

A plaintiff must show proximate cause to prevail on a negligence claim.  *See, e.g., Jones v. Mercy Health Ctr., Inc.*, 155 P.3d 9, 14 (Okla. 2006) ("A plaintiff cannot recover for negligence unless it was the proximate cause of the injuries for which the plaintiff seeks compensation."); *Twyman v. GHK Corp.*, 93 P.3d 51, 54 n.4 ("Causation is a necessary element in proving both negligence and nuisance actions.").

In addition to Mr. Cates's statements discussed above, plaintiffs have submitted the Declaration of J. Berton Fisher, Ph.D.  [Doc. 301-9].  Plaintiffs suggest the Declaration shows that a genuine issue of fact exists as to whether contamination from the Wilcox Process Area has and is migrating to the Church Property via groundwater flow, thereby proximately causing damage to the Church Property.  Dr. Fisher states "[t]he opinions in my report were further bolstered by the February 19, 2020 EA Engineering, Science, and Technology, Inc. [Remedial Investigation] report—which demonstrates that perched water flows northwest from the Wilcox Process Area toward and onto the Church property." [*Id.*, p. 2].  To the contrary, Dr. Fisher's expert report states that "Groundwater at the Wilcox Site flows generally southerly toward Sand Creek," [Doc. 301-10, p. 14], meaning away from the Church property.  In addition, during his November 6, 2019, deposition, Dr. Fisher was asked ". . . do you have any information suggesting that the Wilcox refining activities produced contamination impacts on the Lorraine Refinery property?"  [Doc. 287-8, 207:25-208:03].  In response, Dr. Fisher stated, "as I understand how groundwater should move on this site, I don't see any reason that they would." [*Id.*, 208:07-208:08].  The February 19, 2020, EA Engineering, Science, and Technology, Inc. Remedial Investigation Report prepared for the EPA states "the primary groundwater flow paths are to the south towards Sand Creek," [Doc. 313-8, p. 3], again, *away* from the Church property.  Because Dr. Fisher's Declaration contradicts the report on which it purports to rely, his own expert report, and his deposition

testimony, and because plaintiffs have presented no other evidence supporting the contention that groundwater flows from the Wilcox Site towards the Church Property, no genuine dispute exists as to whether Wilcox proximately caused damage to the Church Property.  Kinder Morgan is therefore granted summary judgment on plaintiffs' negligence claim.[8]

### 3.  Strict Liability

As with negligence, plaintiffs must show causation to prevail on their strict liability claim. However, a strict liability claim requires plaintiffs show that their property was "damaged directly and proximately by ultrahazardous conduct."  *McCormick v. Halliburton Energy Servs., Inc.*, 2015 WL 918767, at *4 (W.D. Okla. Mar. 3, 2015).  As described above, plaintiffs have failed to show that Kinder Morgan or Wilcox undertook *any* conduct to cause damage to plaintiffs' property, let alone any "ultrahazardous" conduct.  As a result, Kinder Morgan is entitled to summary judgment on plaintiffs' strict liability claim.

### 4.  Unjust Enrichment

Plaintiffs must also show causation to succeed on their theory of unjust enrichment.  *See Moore*, 244 F.3d at 1233 (affirming summary judgment in favor of oil company on an unjust enrichment claim where the plaintiff "failed to show that [defendant] caused any pollution or that it has any responsibility for cleaning up the pollution on the property.").  As described above, plaintiffs have not established that Kinder Morgan or Wilcox caused any pollution or that they

---

[8] The EPA has publicly filed Revision 02 of the EA Engineering, Science, and Technology, Inc. Remedial Investigation Report.  The relevant subsection of the Report now reads "the primary groundwater flow path for the perched groundwater zone are to the south towards Sand Creek."  EA Engineering, Science, and Technology, Inc., Remedial Investigation Report Revision 02 Wilcox Oil Company Superfund Site Bristow, Creek County, Oklahoma EPA Identification No. OK0001010917, p. 3-7 (Oct 2020), available at: https://semspub.epa.gov/work/06/90043353.pdf.  The court notes that "an administrative agency's publicly available files . . . traditionally qualify for judicial notice."  *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1213 (10th Cir. 2012).

have any responsibility for cleaning up the pollution on the Church Property.  Kinder Morgan is therefore granted summary judgment on plaintiffs' unjust enrichment claim.

### D.  Damages

#### 1.  Personal Injury Claims

"Oklahoma law generally requires expert testimony for complex issues of medical causation."  *Hall v. Conoco Inc.*, 886 F.3d 1308, 1317 (10th Cir. 2018).  For the reasons explained in the court's order granting defendants' Motion to Exclude the Expert Testimony of Robert Harrison, M.D., M.P.H., Dr. Harrison's testimony has been excluded.  [Doc. 348].  Plaintiffs offer no other expert testimony on medical causation.  Accordingly, plaintiffs have failed to proffer evidence sufficient to create an issue of material fact on their personal injury claims.  Kinder Morgan is granted summary judgment on the personal injury claims of the Evans plaintiffs.

#### 2.  Real Property Damages

As to real property damages, plaintiffs contend that "the testimony of Rick Carlile [Plaintiffs' real estate appraiser] is sufficient to support the real property claims."  [Doc. 301, p. 43].  For the reasons explained in the court's order granting defendants' Motion to Exclude the Expert Testimony of Rick Carlile, Appraiser for Plaintiff Bristow First Assembly of God, Mr. Carlile's testimony has been excluded.  [Doc. 345].  Plaintiffs do not argue they have submitted any other evidence upon which real property damages may be awarded.  Kinder Morgan is therefore granted summary judgment on plaintiffs' claim for real property damages.

#### 3.  Punitive Damages

Plaintiffs argue that Kinder Morgan is liable for punitive damages to the same extent as El Paso Corporation.  [Doc. 301, p. 43].  As discussed above, the parties disagree as to whether Kinder Morgan and El Paso merged, but even if they did, this would establish only that Kinder Morgan now bears the responsibility for the liabilities previously belonging to El Paso.  Plaintiffs have

failed to produce evidence El Paso has any liability in this action.  They have also failed to produce evidence that Kinder Morgan or El Paso (or any predecessor for which either entity bears liability) acted with the type of "reckless and wanton disregard" that is prerequisite to punitive damages. *Graham v. Keuchel*, 847 P.2d 342, 363 (Okla. 1993).  Kinder Morgan is therefore granted summary judgment on plaintiffs' claim for punitive damages.

### V.  Conclusion

WHEREFORE, the Motion for Summary Judgment of defendant Kinder Morgan, Inc., [Doc. 287], is granted.

IT IS SO ORDERED this 2nd day of March 2023.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE